F. B. Miller Agency, Inc., Appellee, v. The Home Insurance Company et al., Appellants.

420

Opinion filed June 4, 1934. Re-
hearing denied August 27, 1934.

HICKS & FOLONIE, CRAIG & CRAIG and JOHN L. KAGY,
for appellants.

JUNE C. SMITH, WHAM & WHAM and HUGH V. MUR-
RAY, JR., for appellee.

MR. JUSTICE MURPHY delivered the opinion of the
court.

F. B. Miller Agency, Inc., hereinafter referred to as
plaintiff, instituted in the circuit court of Marion
county its action of trespass on the case against 11
insurance companies and 11 individuals. With the
exception of defendant John O. Bolin, all the individu-
als were alleged to be the State or special agents, re-
spectively, of said companies. Bolin was the pur-
chaser of the property which was the subject of this
controversy. At the conclusion of all the evidence,
plaintiff dismissed as to Bolin and certain other indi-
vidual defendants. Judgment was entered against all
the companies and five of the individuals. They all
join in this appeal and will be hereinafter referred to
as defendants.

The declaration upon which the case was tried consisted of four counts. The first charged that the plaintiff was the duly authorized agent of the defendant companies to solicit, execute and issue their respective contracts or policies of insurance in the City of Centralia; that as compensation, it was to receive a percentage of the premiums; that in connection with said business, the plaintiff was possessed and the owner of certain books, records, lists of the dates of expiration of the policies of insurance, commonly known as expirations; that May 12, 1932, the defendants, contriving and intending to injure plaintiff's business, wrongfully and maliciously, did take and carry away from said plaintiff the said records and memoranda and converted them to their own use.

The second count charged substantially the same acts of conversion and intent to injure plaintiff's business as the first count but further charged that after the conversion on May 12, defendants wrongfully published and declared to the public and to the insurance customers of the plaintiff that all of plaintiff's agencies had been sold to John O. Bolin and that persons holding policies issued by plaintiff's agency should look to the Bolin Agency for further insurance service.

The third count charged a conspiracy to damage and destroy plaintiff's business and that by virtue and in consequence of the conspiracy, the defendants terminated plaintiff's authority to represent them as their agent, wrongfully and maliciously converted to their own use certain property being the same property described in the first count, and published to the public and the customers of the plaintiff the same matters as charged in the second count.

The fourth count was the same as the third, except that it was alleged as an additional consequence of the conspiracy, the defendants did after the conversion of the property wrongfully and maliciously complain to the State Insurance Department that the plain-

tiff and its officers were unfit and not qualified to engage in the insurance business and not entitled to a license as required by law and that by reason thereof plaintiff was hindered and delayed in procuring a license.

The defendants filed the general issue plea and each of the defendant companies filed two special pleas; one denied that any of the individual defendants, except their own agent, was their agent and the other plea denied plaintiff's agency and ownership of the property.

Trial was had before the court and resulted in a finding and judgment against all the defendants for $16,500, which included $8,275 punitive damages.

The evidence shows that F. B. Miller started writing insurance under and pursuant to agency contracts in 1907 and continued until the business was transferred to the plaintiff company at the time of its incorporation, July 7, 1930. R. F. Niblo entered Miller's employ in 1921 and devoted all his time to the business until the incorporation of plaintiff's company. During Niblo's employment the earned commissions rose from $500 in 1921 to $10,000 in 1930.

Plaintiff company was incorporated with a capital stock of $20,000, with 200 shares. F. B. Miller and wife owned 198 of the shares, Niblo one and Florence McCawley, an employee in the office, one. There was never any change in the ownership of the stock. The power granted in the charter was to act as agent for insurance companies and to solicit and write insurance of all kinds.

At the time of incorporation, F. B. Miller transferred to the corporation in payment of stock, furniture and fixtures, $6,000, accounts receivable $14,318.48 and insurance agencies and insurance business $13,581.46. The company assumed certain obligations of the business.

Miller was president, Niblo vice president, and Florence McCawley, secretary-treasurer. After the incorporation, the business was conducted along the same general lines as before, and the agency contracts which Miller had held with the defendant companies were transferred to the corporation. Niblo continued in active management of the business.

The commissions collected by Miller for the years 1927–1929, inclusive, were approximately $9,000 per year; for 1930, the commissions were $10,299; 1931, $4,992.02 and the first three months of 1932, $834.21.

On April 1, 1932, the plaintiff company owed approximately $10,000, $4,389.02 of which was due the defendant companies for insurance premiums. It had accounts payable of $9,100, part of which was uncollectible, and owned the same office furniture which it had at the time of incorporation.

Miller was director and president of a bank in Centralia which prior to April 1, 1932, had been placed in the hands of a receiver for liquidation. He was personally indebted to the bank in a large amount. $5,100 of the plaintiff's debts were held by this bank but the note evidencing the debt was not signed by the corporate name. The bank held as collateral 105 shares of the capital stock of the plaintiff company. The receiver requested Niblo to sign an affidavit to the effect that said indebtedness was the debt of plaintiff. Miller was in Florida and Niblo sought advice in reference to said affidavit from defendant Coen who was the representative of the Home Insurance Company. He advised Niblo to consult a lawyer and went with him to see one. The lawyer advised Niblo to sign the affidavit but Coen was not satisfied with the advice and suggested they see another lawyer which was done. Defendant Wallace was called into the conference and a general discussion of the financial condition of the plaintiff company was had. That night, with the con-

sent of Niblo, the supplies, expiration records and private memoranda were removed from the office occupied by the plaintiff to a nearby room. Wallace immediately communicated with the representatives of the defendant companies and a meeting of the representatives and Niblo was had April 1 and the action taken in removing the records was fully discussed. Immediately following the removal of the supplies the several agency contracts between the plaintiff and defendant companies were terminated by action of the companies acting through their representatives.

After the removal of the files from the office, it was arranged that Niblo should collect outstanding accounts due the plaintiff and the agents of all the defendant companies agreed that all amounts so collected should be paid to Wallace. At the time of the removal of the files, there was no talk of sale of the property of the plaintiff but the whole object seemed to have been to collect enough of the accounts due the plaintiff to discharge its debts to the defendants, as they say, to save the agency.

A few days after April 1, Wallace made repeated requests of Niblo to collect the accounts and finally it was suggested by him that the business would have to be sold and Niblo made inquiry of various prospective purchasers but to no avail. The parties talking of sale at this time evidently contemplated the sale of the entire assets except perhaps the accounts receivable. Collections made by Niblo between April 1 and May 12 and credits from cancellations reduced the aggregate debt of plaintiff to all the defendant companies to less than $2,000. The greater part of this had been paid to Wallace prior to May 1st.

Wallace on May 7 sold to John O. Bolin for $2,000 all the expirations, records, memoranda sheets and all other records which had been removed from the office on April 1 and on the same day all the records

were removed to Bolin's office. Defendants immediately appointed Bolin their respective agent.

After May 12, plaintiff undertook to continue in the insurance business, holding the agency of one fire company and a surety and accident company.

Between the dates of May 12 and September 1, seven of the defendant companies wrote the State Insurance Department to the effect that plaintiff was unethical in its practice and unfit to hold a State license and suggested that the department investigate the matter. All of said letters were centered on the same subject matter, namely, plaintiff's unfitness to act as an agent. The information detailed in the several letters is so similar in wording, composition and manner of presentation that the inference may well be drawn that it was a part of a scheme for concerted action to prevent plaintiff from holding a State license. Miller was summoned before the department to show cause why the license should not be revoked. Interviews were had with Niblo but no licenses were revoked.

The record known in insurance circles as expirations is in effect a copy of the policy issued to the insured, which contains the date of issuance, name of the insured, expiration, amount, premiums, property covered and terms of insurance. This is made by the agent at the time of the issuance of the policy on a blank form furnished by the company. A copy of the same is sent to the company. Plaintiff claims that in addition to said record there were certain memoranda made at the time of the solicitation of the business which referred to matters that were not included in the above and were private in their nature; that they were attached to the so-called expiration record and included in the transfer to Bolin. Defendants do not deny the existence of such memoranda, but those defendants, who were present when the records were removed from plaintiff's office, testified that they did

not see the same. It is evident that the expiration record and the memoranda substantially cover the same subject matter and would be used for the same purpose and we will therefore treat them as one and refer to them as expirations.

It is conceded that defendants had the right to revoke the agency of plaintiff at any time. There is no evidence of any contract or agreement between the parties covering the ownership of said expirations.

Plaintiff claims to be the owner of the expirations while the defendants contend that the ownership is regulated by custom. The custom contended for by defendants is that the agent owns the expirations so long as there is no default in his contract with the company; that by said custom, he is in default if he does not make remittance to the company of the premiums within 45 days from the last day of the month in which the insurance was written and that when such default occurs, the title of the expirations becomes the property of the company.

To prove this custom, defendants introduced the testimony of six witnesses who are engaged in the insurance business in various parts of the State. All testified that the premiums were due to the company within said 45-day period. Each of them testified on direct examination that there was in Illinois in 1932 and for several years prior thereto, a custom that expirations belonged to the agency until the agent defaulted in his payments to the company. On cross-examination, four of these witnesses testified that if the company sold the expirations for more than the amount due it· from the agent, such balance belonged to the agent. One witness was not interrogated on that subject on cross-examination. The sixth witness, defendant Wallace, testified on cross-examination that the surplus from the sale of the expirations belonged to the agent, less expenses incurred by the company in making the sale. The custom covered by the testimony of these

witnesses on direct examination would vest in the company upon default of the agent an absolute title to the expirations, while the evidence given on cross-examination would create in the company a secret lien with the right of sale, with the balance, if any, to be paid to the agent. It could not be both. Such evidence does not tend to establish a custom. Furthermore, none of these witnesses either in direct or cross-examination has testified to a statement of facts that would prove that the custom was so universal and had such uniformity and antiquity that it could be presumed that the parties contracted in reference to it.

A custom or usage to become binding upon the parties must have antiquity as well as uniformity and universality. *Crawford v. Clark,* 15 Ill. 561. It must appear that it has been uniformly acquiesced in for such a period of time that it is presumed that the parties had it in mind at the time of making the contract and that they entered into the contract intending that such custom or usage was a part thereof. *Dixon v. Dunham,* 14 Ill. 324; *Bissell v. Ryan,* 23 Ill. 566. A custom is not established by proving that it was either one of two things. Neither could a custom be established by proving that it was one of two things and that one party had the option to declare which one of the two it would accept. *Federal Reserve Bank of Richmond v. Malloy,* 264 U. S. 160. A custom should be established by the testimony of several witnesses. *Bissell v. Ryan, supra.*

For a long period of time plaintiff company and its predecessor, F. B. Miller, had not observed the custom of making remittance of premiums to the defendant companies within the 45-day period. The payments were remitted and accepted by the companies covering periods from 45 to 120 days from the date of the issuance of the policy. Proof of payment in such manner over such a period of time destroys the presumption

that the parties contracted with reference to the custom.

Under the principles announced in the foregoing authorities, the evidence in this record falls short of establishing a custom controlling the ownership of these expirations.

No case has been cited and we have been unable to find any where the ownership of insurance expirations has been under consideration in the courts of review of this State. Where the matter has been a subject of judicial termination in the courts of other jurisdiction, it has often been decided upon facts applicable to that particular. In *Alliance Ins. Co. v. City Realty Co.*, 52 F. (2d) 271, the court found that the custom contended for by the defendants in this case had been established by the evidence and the default of the agent being conceded, awarded the expirations to the company; in *Arrant v. Georgia Casualty Co.*, 212 Ala. 309, 102 So. 447, the court held that the contract of agency in that case controlled the ownership of expirations; in *Whitney v. Whitney*, 27 Ky. L. Rep. 1197, 88 S. W. 311, the court in a contest between partners directed the sale of the expirations as a part of the partnership assets; in *In re Chapman* (D. C. W. Dist. Ky.), 50 F. (2d) 252, the court held in a bankruptcy matter in a contest between the bankrupt agent and the companies that the company had failed to prove a custom as to ownership of expirations and that the expirations were assets of the agency.

In considering the ownership of expirations, we are aware of the underlying principle of agency, that gives to the principal the ownership of lists of customers and other similar data obtained during the agency and of the rule announced in that line of cases which gives the principal the equitable right to enjoin the agent from the use of such lists after the employment has been terminated on the theory that they are trade secrets. In our opinion, the ownership of the expirations is by

reason of the peculiar relationship existing between an insurance company and its agent, and the nature of the service the agent is to render, removed from the application of the general rule. The agent may represent several companies engaged in writing the same kind of insurance. The agent solicits the business for the agency rather than for any particular company. In doing so, he acquires knowledge of the client's insurance needs and many times the amount of insurance to be written on a single risk is in excess of the amount authorized by any company he represents. He divides the risks among the companies in such manner as he may choose. He may so divide it that some of the companies he represents may not receive any part of it. Any company not receiving any part of the risk could have no right or interest in the record or information contained in such expirations. The agent may devote the whole of his time to the benefit of the agency but the ultimate benefits from such service is divided among the several companies he represents. Expirations are acquired and prepared at the expense of the agent. We are of the opinion that under the facts of this case, justice and fair dealing between the company and the agency demands that the agent be declared to be the owner of the expirations.

Defendants' next contention is that the expirations were sold with the consent of the plaintiff. At times prior to the sale, there were conversations between some of the individual defendants, Niblo and Miller, relative to a sale but in none of such conversations was there anything said or done for or on behalf of the plaintiff that would be binding upon it. Bolin's name as a prospective purchaser was not suggested and no terms of sale were considered. A few days before the sale at a meeting of the representatives of the defendant companies, W. G. Wilson, an attorney, was present, representing the plaintiff, and expressly told them they could not sell the agency. The trial court found

that no consent was given and the evidence supports that finding.

Defendants also contend that the evidence does not prove a conspiracy as alleged in the third and fourth counts. It is not material since there is evidence proving the allegations of the first and second counts and if the proof supports one count that is sufficient to support the judgment. Furthermore, the allegations of conspiracy contained in the third and fourth counts may be treated as surplusage, since the evidence is sufficient to prove that the defendants committed the other wrongful acts alleged in said counts. *Doremus v. Hennessy,* 62 Ill. App. 391; *Hyman v. Burmeister,* 216 Ill. App. 98.

Defendants contend that the advertising notices published by Bolin in the Centralia paper were not binding upon them and should not be considered in assessing damages.

In addition to the agencies of the defendant companies, the plaintiff represented the Travelers' Fire, Travelers' Indemnity, American Surety and the Standard Accident and Surety Companies. When the expirations were removed from plaintiff's office, the records pertaining to the business of these companies were also removed and when the expirations were sold and delivered to Bolin, these records were included therewith. Wallace knew the Travelers' Fire had declined to join the other companies and also knew that none of said companies had revoked plaintiff's agency. The records in reference to the business of these latter companies were kept by Bolin for about 10 days following the sale. In an advertisement in the local paper of issue of May 16, Bolin listed the names of companies he represented and included therein Travelers' Fire and Travelers' Indemnity. Subsequent advertisements at various dates to August 31 appear in the record but the names of these latter companies do not appear therein. Inasmuch as all the companies author-

ized or ratified Wallace's actions in making the sale of the expirations and the advertising being a direct consequence of that sale and having been published in the paper at the request of Bolin, who was then the agent of the several defendants, we are of the opinion that their admission in evidence was proper.

It is defendants' contention that there is no proof of actual damage and therefore no basis for punitive damages. This action is to recover damages to plaintiff's business. Damages to an established business caused by intermeddling or by publication of false reports about the business or other similar, wrongful acts, cannot ordinarily be proven with mathematical exactness but that is not required to justify a recovery. All that the law requires by way of proof of damages is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages. *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286; *Landis v. Wolf*, 206 Ill. 392.

All witnesses, both for the defendants and for the plaintiff, testified that the expirations which were sold had a value. As is usual in such cases, there is a wide variance of opinion as to valuation. The lowest estimate of value fixed by defendants' witness was $3,000, while plaintiff's evidence was $25,000. The written opinion the trial court rendered is printed in the abstract. It shows that the court found the fair market value of this entire agency and of all the property to be $15,000, but that the part remaining had some value and that the actual damage after giving credit for the amount received from the sale of the expirations, which was applied on plaintiff's debts, was $8,225 and added punitive damages to make a total judgment of $16,500. The trial court's finding of actual damages is within the range of the testimony and is supported by the weight of evidence and should be sustained. *Moore v. David J. Molloy Co.*, 222 Ill. App. 295, 298; *People ex rel. Drainage Com'rs v. Chicago & E. I. Ry. Co.*,

258 Ill. App. 535, 540; *MacCracken v. First Nat. Bank of Wheaton,* 204 Ill. App. 20, 21.

The acts of the defendants disclose a wilful and wrongful disregard of plaintiff's rights and the finding of the lower court that the defendants were actuated by malice is supported by the evidence. Punitive damages were properly assessed. *Drohn v. Brewer,* 77 Ill. 280, 284; *Sherman v. Dutch,* 16 Ill. 283; *Johnson v. Camp,* 51 Ill. 219.

The record in this case is voluminous and other points have been urged by the defendants but after a careful examination of the same, we are satisfied that such points are without merit, that the evidence fully supports the findings of the circuit court and that the judgment should be affirmed.

*Judgment affirmed.*