Oppenheimer Bros., Inc., a Missouri Corporation, and Insurance Facilities Corporation of Illinois, an Illinois Corporation, Plaintiffs-Appellants, v. Joyce & Company, an Illinois Corporation, Adams-Clark Agency, Inc., an Illinois Corporation, and Harry T. Huff, Defendants-Appellees.

**Gen. No. 47,411.**

First District, First Division.

December 8, 1958.

Released for publication January 23, 1959.

King, Robin, Gale & Pillinger, of Chicago (Willard L. King, Douglass Pillinger, J. William Braithwaite, of counsel) for plaintiffs-appellants.

Dent, Hampton & Doten, of Chicago for defendants-appellees.

JUSTICE SCHWARTZ delivered the opinion of the court.

This is an appeal from a decree which denied plaintiffs' prayer for an injunction restraining breach of a negative covenant and transferred to the law side a controversy over various items of account. Defendants have filed a cross-appeal from some of the findings in the decree. All the parties are in the insurance brokerage or agency business, and the case involves an arrangement for the promotion and placement of insurance to be underwritten by Lloyd's of London underwriters. The principal issue is whether an alleged usage of the trade exists which requires producing brokers of Lloyd policies to pay the premiums thereon.

Oppenheimer Bros., Inc. (Oppenheimer), plaintiff, of Kansas City, Missouri, has been an American correspondent or subdelegate of Lloyd's London broker. The nature of this relationship will be explained later. Joyce & Company (Joyce), defendant, of Chicago, has been a broker or agent in the procuring of Lloyd's policies of insurance. A formal written contract between Oppenheimer and Joyce was executed September 29, 1952, pursuant to which, Insurance Facilities Corporation of Illinois (IFC) was organized. The stock was divided 51% to Oppenheimer and 49% to Joyce. Joyce covenanted to place with the new company for ten years all its Lloyd's London insurance, and by an express negative covenant agreed that it would not place any of that insurance through any other broker. Oppenheimer agreed to manage the company, and a

36

contract relating to management and operation was executed November 28, 1952. Defendant Harry T. Huff (Huff), president of Joyce, became IFC's first president. Defendant Adams-Clark Agency, Inc. (Adams), a subsidiary of Joyce or closely associated with it, was also in the general insurance brokerage business. For our purpose Adams may be completely identified with Joyce.

The controversy appears to have had its origin in the placement by Huff in 1952 through Oppenheimer of a series of Lloyd's public liability policies insuring the American Bus Lines, a client of Joyce, under an agreement that the premiums would be turned over to IFC when organized. In connection with those policies a deposit of $35,000 was made to insure the payment of premiums. Subsequently the policies were cancelled, and some time afterward the Bus Lines went into bankruptcy. Premiums of $43,675.17 were due and unpaid, and on July 14, 1954, IFC wrote a letter to Joyce, the pertinent portion of which is:

"From the beginning of our operations, by both custom and express understanding, we have held all brokers responsible for all premiums earned under the Lloyd's contracts issued through us, regardless as to whether collection is made from the assured or not."

Joyce promptly denied any liability for uncollected premiums, and IFC thereupon replied that this condition was part of the contract by custom and express understanding, and that it would insist upon its application to all insurance placed through it (IFC). Joyce again replied, stating it was not liable for the premiums; that such a condition was not a part of the terms of the contract; and that if IFC did not withdraw its insistence within fifteen days, Joyce would consider it a breach of the contract and would consider itself relieved of future obligations with respect thereto. IFC did not withdraw from its position, and thereupon

37

Joyce ceased to perform under the contract, and this litigation was instituted.

The matter was referred to a master in chancery, who found that the letter of July 14, 1954 sought to incorporate into the contract an obligation to modify and change the agreement materially; that it was beyond the managerial authority of Oppenheimer to do so, and that Joyce was justified in terminating the agreement of September 29, 1952. The master further specifically found "that the record will not support a finding either (1) that there existed a usage in Illinois that a broker dealing in Lloyd's of London insurance or other foreign insurance policies, assumes the liability or payment of uncollected premiums, or (2) that the parties to the agreement of September 29, 1952 contracted with reference to a usage which would impose upon defendants Joyce & Company and Adams-Clark Agency, Inc., a legal obligation to pay and discharge all premiums due on policies of Lloyd's of London or other foreign insurance companies, whether collected or not."

The findings were approved by the court, and the rule which binds an appellate court in a review of such findings is that they must be sustained unless against the manifest weight of the evidence. Amos v. Helwig, 19 Ill.App.2d 220, and cases cited therein. This statement of the law appears in almost every issue of the supreme and appellate court reports. It is within this limitation that we must consider the factual issues in this case.

Many witnesses were presented by each side. Plaintiffs' witnesses testified that there was a usage or custom holding a broker liable, and defendants' witnesses testified to the contrary. In order to understand a seemingly irreconcilable contradiction, it is necessary to examine the nature of this business. Of all the witnesses presented by the parties, two were outstanding. They understood and envisaged the situation in its

entirety and revealed the true relationship between insured, insurer, London Lloyd's broker, American correspondent or delegate, subdelegate, and the brokers under him. These witnesses were Herbert C. Brook, a member of the law firm of Lord, Bissell & Brook (Lord of that firm is attorney-in-fact for Lloyd's underwriters licensed to do business in Illinois, and the firm represents a committee of Lloyd's involving matters in Illinois) and Cameron Brown, president of George F. Brown & Sons, whose company has a larger share of Lloyd's business than any other Chicago broker. Both men testified that there is no custom holding an American producing broker liable for premiums on non-marine insurance placed with Lloyd's.

Syndicates are organized under Lloyd's auspices. A syndicate delegates authority to an English broker who may subdelegate such authority to an American insurance agency or brokerage firm as, in this case, Oppenheimer, which organized IFC and made the contract with Joyce. Joyce operated through Adams, and Adams in turn had brokers in the field getting insurance. The underwriters cannot accept insurance except from a Lloyd's broker, that is "a person who is accredited to go into the room and place risks with it." All the business of the underwriters is done through the English brokers to whom they look for payment of premiums.

For American business a "correspondent" is licensed, but he is a correspondent of the Lloyd's broker and not a direct correspondent of the underwriter. Sometimes the Lloyd broker will look to the American broker for premiums on business placed through him, and sometimes he does not. In some cases the responsibility of the American correspondent is spelled out in written contracts between the Lloyd's broker and the American correspondent, which, according to Mr. Brook, is getting to be more usual than it was formerly.

39

As seen from the foregoing, there are between insured and insurer four, five or six different entities. A problem thus presented itself to those engaged in this business as to how the extension of credit for premiums could be kept within bounds. The ethics of the trade prohibit the insurer or any of its delegates or sub-delegates from contact with an insured. That must be done through the producing broker. Hence, it has been the custom to bill the producing broker directly. This has been the general practice in all companies. With respect to American brokers dealing with American companies, it is definitely understood that they are not liable, even though so billed. With respect to Lloyd's the case is not as clear.

As far as we know, no American case exists in which that liability has been sustained as to Lloyd's insurance as a matter of usage. We have been referred to none by counsel. The reason for such lack of authority is evident from Brown's testimony. He had meetings in London with a special committee of Lloyd's underwriters, directed mainly to altering Lloyd's practices, principally those having to do with the responsibility of American correspondents to Lloyd's for premiums. Brown stated that although they had not *contracted* to do so, they have paid uncollected premiums, because if they had refused to do so, *Lloyd's would cease to do business with them.* Brown said: "Each month we send him (the broker) a statement of his account. If the premiums are not paid, we call, write, wire, use any communication we can to ask him why they aren't paid. If they still aren't paid . . . *we send a direct notice of cancellation to the insured.*" When pressed on the question of holding a broker liable, he said: "As a matter of practice, if a producing broker won't cooperate, we stop doing business with him immediately. If he does cooperate fully and the circumstances seem beyond his control, that is when we go to London and

attempt to get relief from the underwriters." "Q. But you never relieve him on his statement that he is unable to collect it? A. *We don't relieve him because we don't hold him,* in our opinion, liable for the premium personally." In response to his request for a change in the practice of Lloyd's, Brown was told that this was an integral part of the way Lloyd's did business and that Board of Trade regulations would not permit otherwise, *in advance of the particular case arising,* but underwriters are prepared to give sympathetic consideration to individual problems presented to them and decide each case on the merits. Thus, it is clear that it is not the *law* of custom or usage which is relied on, but the powerful sanction of disassociation with Lloyd's. This is further supported by testimony of Howard Mankin, a witness for plaintiffs, who testified that a general custom exists, but when questioned as to what would happen in case of a refusal to perform the obligation, said that the contracts existing between American brokers and the London group are considered valuable assets of agents in the United States; that a cancellation for any reason whatsoever would represent a distinct loss to the American Lloyd's representative. Mankin said: "It goes even a little further than that. It is a nine to one bet if you ever lost your contract in London that you will never get another."

Our conclusion is that this rule, strongly resisted and often relaxed so far as American brokers are concerned, is a disciplinary measure to guard against improvident credit, and no legal sanctions have been contemplated by the parties as a means of enforcement. What has been relied on is the prospect of loss by the broker of a valuable association, and on the other side, the prospect of Lloyd's facing a loss of business if they should make this a definite term of their contracts. This explains the giving of instructions that brokers would be held liable but not resort to the courts to

41

enforce liability, the billing of premiums to producing brokers, examination into the financial rating of brokers, appeals of brokers for relief, and other matters. It also explains why there are no litigated cases as authority on this point despite the fact that there must be many disputes of this kind in a business of such great magnitude. It is to this state of facts that we must apply the law.

■ ■ Plaintiffs proceeded to trial with the expectation of proving a custom. However, during the course of the trial they abandoned that position and undertook to prove usage. The distinction is not entirely clear. Custom is broad enough to include usage, but usage apparently does not require the degree of universality, antiquity or generality of a custom. On the other hand, it must be shown that the usage was either expressly or impliedly agreed to. This appears to be the substance of paragraph 247, Restatement of the Law, Contracts, and of Williston on Contracts, 1936 Ed., paragraphs 649, 651, 660. While the distinction was early recognized in Illinois law (Dixon v. Dunham, 14 Ill. 324 (1853)), the cases continued to confuse custom and usage. A practice such as the one here in question, which is still the subject of controversy in the trade, and is submitted to upon pain of the disruption of an advantageous business association, is not the type of usage or custom which a court will enforce. Dixon v. Dunham, 14 Ill. 324 (1853); Klaub v. Vokoun, 169 Ill. App. 434 (1912); Currie v. Syndicate Des Cultivators Des Oignons a' Fleur, 104 Ill. App. 165, 169 (1902); Miller Agency, Inc. v. Home Ins. Co., 276 Ill. App. 418, 427 (1934); Traff v. Fabro, 337 Ill. App. 83 (1949). In Dixon v. Dunham, supra, the court said, p. 327:

"Uniformity as well as antiquity are essential to the validity of such a custom. Where it has been the subject of controversy and contention, claimed by one class and denied by another, and only submitted to under

protest and to avoid litigation, it cannot be presumed to have been so acquiesced in as to have entered into and formed a part of the contract. A valid usage must be not only submitted to, but should receive at least the tacit acquiescence of all classes engaged in the trade which it sought to affect and control."

█ The insistence of plaintiffs that Joyce pay the premiums whether collected or not, made it impossible for Joyce to perform the contract without acceding to their demand and was in effect an anticipatory breach of the contract by plaintiffs which relieved Joyce from his obligations thereunder. Restatement of the Law, Contracts, Vol. 1, Sec. 318, p. 475; Lake Shore & M. S. Ry. Co. v. Richards, 152 Ill. 59, 80 (1894); Follansbee v. Adams, 86 Ill. 13, 15, 16 (1877); The Chamber of Commerce of the City of Chicago v. Sollitt, 43 Ill. 519, 523 (1866); DeLeuw, Cather & Co. v. City of Joliet, 327 Ill. App. 453, 465–6 (1945); Woods v. Village of LaGrange Park, 298 Ill. App. 595, 617 (1939); McNeff v. White Eagle Brewing Co., 294 Ill. App. 37, 42–3 (1938); Banik v. Bishop-Stoddard Cafeteria Co., 288 Ill. App. 174, 179 (1937).

A cross-appeal has been taken by defendants from that portion of the decree which sustained certain exceptions of plaintiffs and denied certain exceptions of defendants to the master's report. The first four exceptions to the master's report, which the court sustained, relate to the deposit of $35,000 made by the American Bus Lines. Settlement of this matter has been made since the decree was entered, and all the parties involved have mutually released each other as to all money liability for both the premiums of $43,675.17 and the $35,000 deposit. We see nothing for us to decide with respect to that matter. The same applies to those exceptions to the master's report made by defendants, and sustained by the court, relating to the deposit of $35,000. The court sustained plaintiffs' exception No. 5 to the master's report. This

relates to an item of $600 which, it is claimed, defendant Huff improperly took from IFC as expenses for a trip to California. While the court sustained the exception, the decree grants no final remedy, and we see no purpose in our passing upon the matter at this time. Other exceptions sustained by the master seem to us to be outside the proper scope of a cross-appeal and are in effect disposed of by this opinion.

██ ██ The complaint seeks an accounting from defendant Huff with respect to breaches of his fiduciary obligations, and asserts claims against Joyce with respect thereto. Defendants sought to have these issues separated from the principal issue, which has been discussed here, made a jury demand, and sought to have these issues transferred to the law side of the court. Fiduciary obligations are here involved, and it is and should be the purpose of equity to administer complete relief in one suit. Where equity has acquired jurisdiction for the purpose of administering equitable relief, it may determine all matters at issue, although by so doing it may grant legal rights and establish legal remedies at the same time. McIntyre v. McIntyre, 287 Ill. 544, 550 (1919); Keith v. Henkleman, 173 Ill. 137, 141 (1898). This matter should be completely disposed of in chancery, where unquestionably such issues can receive a more expeditious and less cumbersome hearing than would be involved in presenting the issues to a law court.

The order of the trial court transferring these issues to the law side is reversed and the cause is remanded for further proceedings in respect thereto not inconsistent with the views herein expressed. In other respects the decree of the court is affirmed.

Affirmed in part, reversed in part, and cause remanded for further proceedings.

McCORMICK, P. J. and ROBSON, J., concur.