Bella Kay Building Corporation, an Illinois Corporation, and Walter's Union Market, Inc., an Illinois Corporation, Plaintiffs-Appellees, Walter's Union Market, Inc., an Illinois Corporation, Cross-Appellant, v. City of Chicago, a Municipal Corporation; Santucci Construction Company, an Illinois Corporation, and George L. Ramsey, Building Commissioner of the City of Chicago, Defendants, City of Chicago, a Municipal Corporation, Defendant-Appellant, Cross-Appellee, Santucci Construction Company, an Illinois Corporation, Defendant-Appellee, Cross-Appellant.

City of Chicago, a Municipal Corporation, Counterplaintiff-Appellant, Cross-Appellee, v. Santucci Construction Company, an Illinois Corporation, Counterdefendant-Appellee, Cross-Appellant.

Santucci Construction Company, an Illinois Corporation, Counterplaintiff-Appellee, Cross-Appellant, v. City of Chicago, a Municipal Corporation, Counterdefendant-Appellant, Cross-Appellee.

Gen. No. 49,111.

First District, Third Division.

April 22, 1965.

Rehearing denied May 20, 1965.

John C. Melaniphy, Corporation Counsel, of Chicago (Sydney R. Drebin and Robert J. Collins, Assistant Corporation Counsel, of counsel), for City of Chicago, appellant and cross-appellee.

Lord, Bissell & Brook, of Chicago (Stephen A. Milwid, of counsel), for Santucci Construction Company, appellee and cross-appellant; Spray, Price, Townsend & Cushman, of Chicago (Robert S. Cushman and Richard S. Ratcliff, of counsel), for Bella Kay Building Corporation, appellee, and Walter's Union Market, Inc., appellee and cross-appellant and cross-appellee.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

This suit presents a group of causes commingling law and equity. All arise out of the collapse of portions of the east and north walls of a building at 733 West Fulton Street, in Chicago, Illinois, used as a wholesale fish market. The collapse allegedly was due to inadequate shoring and bracing of the building by Santucci Construction Company (Santucci) while ex-

cavating for a sewer to be built as part of the Northwest Superhighway. The plaintiffs are the Bella Kay Building Corporation (Bella Kay) which owned the building, and Walter's Union Market, Inc., (Walter's) a tenant in the building. The defendants are the City of Chicago (City) and Santucci, the contractor, which have also filed cross-claims against each other. No questions are raised on the pleadings. It will serve the purpose of clarification if we tabulate the disputes, what they involve, the dispositions made of them, and the appeals taken, and consider them in that order.

## Claim I.

Bella Kay sought to enforce specifically a stipulation in a prior condemnation proceeding by which the City agreed to protect and maintain the east wall of the building during the construction of the Northwest Superhighway, or, in the alternative, to recover damages from the City for breach of the stipulation.

Bella Kay obtained a decree for $63,585.91 damages against the City, from which decree the City has appealed.

## Claims II and III.

In the same complaint, Walter's seeks from the City (Claim II) and from Santucci (Claim III) the damages it suffered as the result of the collapse of the walls.

The master recommended and the court ordered that these claims be transferred to the law docket for trial by jury, and the jury returned a verdict in favor of Walter's in the sum of $6,000 against the City, and in the sum of $12,000 against Santucci, and judgments were entered thereon.

233

The City did not appeal from the judgment for $6,000. Santucci has appealed from the judgment on the verdict against it. Walter's has cross-appealed on the ground that both verdicts were inadequate.

### Claims IV and V.

The City filed a counterclaim against Santucci (Claim IV) and Santucci filed a counterclaim against the City (Claim V). Each counterclaim prayed that the counter-defendant be required to pay whatever amounts Bella Kay and Walter's should recover against the counterclaimants.

The counterclaims were tried by the same jury which tried Walter's claims against the City and Santucci. The jury returned a verdict against both the City and Santucci on their counterclaims against each other, and both have appealed.

The overriding issue on this appeal is between the City and Santucci as to which should bear the loss caused Bella Kay and Walter's by the collapse of the building. Santucci argues that the City prepared inadequate and misleading plans, while the City argues that, under its contract with Santucci and the bond which Santucci gave, Santucci is responsible, and that in any event, it was Santucci's inadequate shoring and bracing that were the cause of the collapse. Other questions involve the amount of Bella Kay's and Walter's damages and the admissibility of certain evidence. For an orderly presentation of this complex litigation, the statement of facts will be followed by consideration of Bella Kay's claim against the City (Claim I), Walter's claim against the City (Claim II) and against Santucci (Claim III) and City's (Claim IV) and Santucci's (Claim V) claims against each other.

234

Prior to 1950, Morris Fisheries (a forerunner of Bella Kay) owned the property at 729–33 West Fulton Street, Chicago. The property was improved with a building, the east part of which was four stories high, and the west part, one story. The City filed a condemnation proceeding to acquire the four-story part of the property as right-of-way for the Northwest Superhighway. The two parts of the building had a common adjoining wall, and a stipulation was entered into between Morris Fisheries, predecessor of Bella Kay, and the City with respect to that wall. This stipulation was included in and made a part of the 1951 judgment order in the condemnation case. That judgment provided, inter alia:

> "the City of Chicago shall at its expense knock down and demolish the westerly wall of the premises condemned to the height of the one-story building remaining west of and adjacent to the building condemned herein, provide the necessary coping for said wall, brick up the present opening in said wall, and protect and maintain said wall during the construction of the Superhighway."

By mesne conveyances Bella Kay acquired title to the premises in 1954 and has owned it since that time. It leased the entire premises to Walter's, which conducted a wholesale fish business therein. The principal shareholders in Bella Kay are also the principal shareholders in Walter's.

On or about March 14, 1957, Santucci and the City entered into a contract for the construction of a sewer as a part of the Northwest Superhighway. Under the terms of the contract, the City specifically called Santucci's attention to the one-story building at 733 West Fulton Street in which plaintiffs Bella Kay and Walter's were located and said that Santucci "shall exercise special care in working adjacent to this

235

building and shall use such methods, subject to the approval of the Commissioner, as will insure against any movement of earth or settlement of the building foundation. . . ." Santucci was under obligation to furnish, place and maintain all sheeting, bracing and lining required to properly maintain trenches and other excavations in the open cut and to prevent all movements of the soil, pavement, utilities or other structures outside the trench pit or tunnel. The sheeting, bracing and lining was to be so placed as to allow the work to be constructed on the lines and grades shown on the plans or established by the Commissioner.

The contract further provided that where buildings or existing structures are shown on the plans, the information (given by the City) is believed to be accurate, *but that it is not so guaranteed and that Santucci shall satisfy itself by such methods as it may prefer as to the character of the ground and the location of all structures that may be encountered in the course of the construction of the work.* (Emphasis supplied.) Under the terms of the contract, work was to begin only after Santucci's proposed order of procedure in performing the work, and the methods, structures and equipment to be employed by it in so doing had been submitted to and approved by the City's engineer in writing. It was further provided, however, that the acceptance or approval of any method of procedure employed by Santucci should not in any manner relieve Santucci of responsibility or from any liability whatsoever on account of any procedure or method employed by it, or due to any failure or movement of any structure or equipment furnished by it. In other words, the City anticipated the type of claim now made by Santucci and provided against it. The City had the right to stop all work under the contract if it was not done according to the plans.

236

With respect to Santucci's liability for property damage and its duty to indemnify the City, the contract stated:

"The contractor covenants and agrees to pay all damages for injuries to real or personal property growing out of any negligent act or deed or any negligent ommission to act of the Contractor or any sub-contractor or any servant, agent or employee of the Contractor or any sub-contractor in the performance of work under the contract, and to indemnify, save and keep the City harmless against all liabilities, judgments, costs, damages and expenses which may in anywise come against the City for or on account of injuries to real or personal property caused by any negligent act or deed, or any negligent ommission to act, of the Contractor or any sub-contractor or any servant, agent or employee of the Contractor or any sub-contractor in the performance of said work. . . ."

Santucci provided a surety bond as required, which among other things, recited:

"Now, if the said Contractor [Santucci] shall in all respects well and truly keep and perform the said contract on its part, in accordance with the terms thereof and the plans and specifications therein referred to, and in the time and manner therein prescribed and further shall indemnify, keep and save harmless the City of Chicago against all liabilities, judgments, costs, damages and expenses which may in any wise come against said City of Chicago, in consequence of the granting of such contract, or which may in any wise result from the carelessness or neglect of said Contractor, its Agents, Employees or Workmen, assignees or subcontractors in any respect whatever . . . then

237

is this obligation to be null and void, otherwise to remain in full force and effect. . . ."

The contract with Santucci covered more than a mile of the sewer, and it was not until late April 1958 that Santucci commenced working in the vicinity of plaintiffs' building. Fulton Street runs east and west, and 733 West Fulton Street is on the south side of the street. In order to connect up an existing sewer running east-west under Fulton Street with the larger east-west sewer running underneath the Northwest Expressway, which at that point ran nearly north-south just east of plaintiffs' east wall, it was necessary under the plans drawn by the City for Santucci to construct a "neck" connecting the larger sewer with the smaller one in a trench about 25 feet deep at a point just a few yards northeast of the northeast corner of plaintiffs' building.

Prior to the actual excavation, both J. Walter Grimm, the City's assistant chief engineer who had full supervision of all construction jobs, and Thomas W. Simpson, its resident engineer whose duty it was daily to supervise construction of the work and to see that the contractor followed the plans and specifications, warned Santucci about the building and the need for special care. There were also conversations to the same effect with Kenneth Bennett, Santucci's resident engineer, who was in the area daily, and with Angelo Ventrella, Santucci's superintendent, who had about a dozen men working on the job. There were no City employees on the job, and Simpson, the City resident engineer, had no authority over any of Santucci's employees.

On or about April 25, 1958, Santucci began inserting sheet piling adjacent to the northeast corner of plaintiffs' building, in order to prevent the wall and the soil from shifting in the forthcoming excavation for

238

the "neck." No plans for the insertion of the sheet piling by Santucci were ever submitted to the City, although so provided for by the contract. Bennett, Santucci's resident engineer, testified that he was not consulted before the piling was sent from Santucci's main office. Although there were several conversations between Simpson and Bennett and Ventrella as to the insertion of the piling, there was nothing in the City's plans which indicated how the piling was to be installed.

Sheeting or sheet piling consists of steel strips, 15 or 16 inches wide and many feet long, which are driven into the ground, each strip separately, and are interlaced to form a common wall. The piling was not placed in a straight line, but in a curved fashion around the northeast corner of the building. As a consequence it was impossible to place horizontal steel beams called "whalers" against the vertically driven sheet piling, in order to hold the piling in a rigid position and a straight line. Instead, wooden braces, like telephone poles, were used, which ran on a diagonal from the sheet piling to the floor or to the opposite wall of the excavation.

On Friday, May 2, 1958, Santucci was excavating close to plaintiffs' building. Walter Nesgood, president of Walter's told Ventrella, who was operating the crane for Santucci, that he was coming "awfully close" to the wall and hurting it, but Ventrella shrugged his shoulders and continued to excavate. The excavation continued on Saturday, and that night it rained, the rain continuing into Sunday. On Monday, May 5, 1958, when Nesgood came to work, he noticed a three to four inch verticle crack in the east wall of the building, just south of the south end of the curved sheet piling. There were also cracks in the ground to the south of the piling. Nesgood told Ventrella about it, but Ventrella again shrugged and kept on digging.

239

On May 8, 1958, the City received a letter from Santucci dated May 6, 1958, stating that "a great deal of hazardous [sic] in maintaining the building" had been encountered and that it would demand extra payment. Furthermore, Santucci professed the belief that according to the City's plans, the plaintiffs' building should have been razed, and stated that unless this was done, it (Santucci) would not assume any responsibility for what happened to the building. The City answered Santucci's letter, saying it was inconceivable that Santucci was of the belief that the subject building was to be razed, when the specifications directed that special care should be taken of that building. The City's letter further asserted that Santucci was responsible for all damage to private property.

Subsequent to May 5, 1958, when the crack appeared in the building, the wall continued to separate. In the early part of September, part of the east wall of the building separated from the north wall and collapsed, and the steel sheeting buckled outward into the path of the sewer. It became necessary to put up a temporary wooden wall and then to install new sheet piling with whalers, so that the sewer could be built according to the specifications.

On September 23, 1958, Bella Kay filed a complaint (Claim I) specifically to enforce the stipulation referred to in the introductory part of this opinion, in which the City had agreed to protect and maintain the east wall of the building during the construction of the Northwest Superhighway. In the alternative, Bella Kay sought to recover damages from the City for breach of the stipulation. On September 26, three days after the complaint was filed, a temporary injunction was issued "commanding the City of Chicago within 120 days from this date to commence and diligently prosecute to a conclusion the restoration of

said wall and the said building, including the coolers and freezers therein, to the condition in which they and each of them were prior to the construction of said sewer without cost or expense to plaintiffs." The City made no motion to vacate the temporary injunction and took no appeal therefrom.

## Claim I.

Bella Kay's claim was referred to a master, who recommended the award of $63,585.91, against the City, on which the decree was entered. The City's theory as to this claim is that the evidence does not sustain the amount of the judgment.

At the hearing before the master, Bella Kay proved its damages by the testimony of William Kaplan and David R. Thomas. Kaplan, a real estate broker, expressed the opinion that the building was about fifty years old; that immediately prior to the collapse, the premises had a fair cash market value of $80,000; that following the collapse the property would have the same value, except for the cost of restoration which would be about $50,000 or $55,000. Thomas, an engineer employed by Bella Kay to determine the extent of the damages to the building and the cost of repairing it, had observed the building since June 1958 and began a detailed investigation of it in the latter part of June 1960. He described the damages to the east and north walls of the building, the roof, the freezer coils and insulation, the floor, floor drains, electrical fixtures, and the foundation. Following his investigation, he caused plans and specifications to be prepared for the repair of the damage. He then advertised for bids from contractors to do the reconstruction and repair work in accordance with such plans and specifications. Thomas estimated what the bids ought to run and arrived at a figure of between $60,000 and $70,000.

241

Three bids were received from contractors who Thomas testified were well qualified to do remodeling and repair work. The lowest bid was $55,869, and the other bids were for $58,500 and $59,900. These bids were admitted in evidence over the objection of the City. Thomas was then asked, "Now, from your knowledge and experience as an engineer will you state whether or not . . . that [the low] bid represents a fair and reasonable cost of performing the work set forth in the bid in this specification." He replied that he believed it did.

Harry L. Shlaes, a real estate broker and appraiser who had extensive experience in buying, selling, managing and appraising Chicago real estate, testified for the City. He valued the property at 733 West Fulton Street immediately prior to the collapse at $85,000, or $5000 more than Kaplan's appraisal.

Two witnesses testified for the City as to the cost of repairing the damage to the building. H. A. Kuehl, a civil engineer, said he had made an estimate on August 7, 1958, that the cost of restoring the building to its original condition would be $15,064.30 When asked on cross-examination for a breakdown of his estimate, he was unable to locate it.

Thomas V. Heavey, a general contractor who had been engaged by the City to make appraisals along the Northwest Superhighway, testified that the age of the building was probably eighty years, and he estimated the cost of repairing the building at $15,074. His estimate was broken down into items, and he testified about the cost of each item in the estimate. On cross-examination he admitted that he did not include any amount for repair of the damage to the freezer or the freezing machinery or equipment. He did not think that caissons were necessary because the earth had been disturbed. He felt that footings were sufficient.

 

Mr. Thomas examined the estimate of the cost of repairs which Heavey had prepared and testified that it omitted many items and was merely an estimate and not a proposal to do the work. In addition to omitting the cost of installing caissons, the estimate omitted provisions for repair of the office area and the underlying supporting beams or girders. It contained no provision for contractors' profits or overhead, insurance, taxes or a watchman. These costs would have increased the total cost of the operation to approximately the low bid submitted to Bella Kay. Thomas said it was his opinion that "the three bids which I received from contractors for this work were within the range that I would consider from my judgment and experience as a reasonable cost for doing this work."

The City argues that the master should not have considered William Kaplan's testimony because he was a real estate broker and not a structural engineer and therefore could not testify to the cost of repairing the building, and as a consequence his evidence cannot be considered on appeal, and that Thomas' testimony is completely worthless because on cross-examination, he could not state the amount of cost allocated to certain items in the specifications.

█ The master apparently did not rely on Kaplan's testimony. There is sufficient evidence to sustain the finding without his testimony. The argument that Mr. Thomas' testimony was completely worthless because on cross-examination he could not state the amount allocated to certains items in the specifications, goes only to the weight to be given his testimony.

█ The City argues that it was error to admit in evidence the bids for reconstruction and repair of the building because they were hearsay, also because they were lump sum bids, not broken down into specific items of cost, and thus the City was denied the opportunity to cross-examine the contractors who sub-

mitted the lump sum bids to find the specific costs of each item. It is true, as Bella Kay argues, that under certain circumstances, offers to purchase real estate have been held admissible in condemnation proceedings, as evidence of the value of real estate. Chicago v. Lehmann, 262 Ill 468, 104 NE 829. Such offers are proved by the testimony of the person to whom the offer is made, without calling the offerer. There is no reason, Bella Kay argues, why bids of well qualified bidders should not likewise be admissible as evidence of the cost of repair and reconstruction work, on the testimony of the engineer to whom the written bids were delivered. That situation is not analogous to the case at bar. The third parties who made the offer to repair were solicited for the job by Thomas, engineer for Bella Kay. There was no evidence as to whether the bidders understood that this was for use in court or for actual performance of work. In the case of offers to purchase real estate, only bona fide offers are accepted; that is, offers made by bidders who had no knowledge of pending condemnation of the property. No similar assurances are presented here. The bids therefore were not admissible.

█ Other evidence, however, supported the decree. Thomas, Bella Kay's engineer, testified that his estimate of the cost of the work, before bids were solicited, was from $60,000 to $70,000. He also expressed the opinion that all three bids he received were within the range of the reasonable cost of such work, and that from his knowledge and judgment as an engineer, the low bid was the reasonable cost of doing the work. The ultimate basis for deciding whether to accept or reject any construction bid is the engineer's judgment as to whether or not the bid represented the fair and reasonable cost of performance of the work. There is sufficient evidence in the record to support Bella Kay's judgment.

It is argued that Bella Kay made no attempt to minimize its damages, that the plaintiffs did nothing to protect the building, ·and that they claimed no income tax loss or insurance loss. Bella Kay had no opportunity to mitigate damages. When the east wall of the building started to crack on May 5, 1958, no protective measures taken within the building or premises could possibly have saved the wall, since the source of the trouble was the continuing movement of the earth, caused by Santucci's excavation on city property. Bella Kay had no duty to run Santucci's men off the job and take over the task of installing additional sheet piling on city property in Santucci's excavation. By September 1958 the damage had already been done, and it was no longer a question of attempting to mitigate the damages to the building. With respect to plaintiffs deducting tax and insurance losses, even assuming this was relevant to the issue, there is no evidence that Bella Kay had any insurance or any taxable income for 1958, against which the taking of an income tax deduction would have been of any benefit to it. Such matters, however, are irrelevant to the issue of damages because they go to the question of who should bear the loss, rather than the amount of the loss. It is our conclusion that the amount of the award to Bella Kay is supported by the evidence.

■ The City argues that Santucci was an independent contractor and that it alone is liable to Bella Kay for whatever damages were sustained. The liability of the City is based upon the stipulation entered into in the condemnation suit. Stipulations of this character have become more or less common procedure in condemnation proceedings, and it has been held that the petitioner in such proceeding may obligate itself by stipulation to pay the damages, as was done in the instant case. East Peoria Sanitary Dist. v. Toledo, P. & W. R. R. Co., 353 Ill 296, 187 NE 512;

Chicago v. Lord, 276 Ill 571, 115 NE 397; Lyon v. Hammond & B. I. R. Co., 167 Ill 527, 47 NE 775.

The chancellor properly found in favor of Bella Kay and against the City.

## Claims II–III.

We turn to a consideration of the judgments entered on verdicts in favor of Walter's—$6000 against the City in Claim II, and $12,000 against Santucci in Claim III. Claim II was based on the agreement by the City to protect and maintain the wall. Claim III, against Santucci, is based upon negligence in the excavation work. These claims and Counterclaims IV and V, which the City and Santucci filed against each other, were all tried together before a judge and jury. Walter's and Santucci have each cross-appealed from the judgments rendered in Claim III. The City has not appealed from the judgment against it in favor of Walter's.

Walter's contends that the damages awarded are inadequate and that the trial court erroneously excluded testimony offered in proof of damages. These contentions go unanswered by anything which appears in the Points and Authorities or in the arguments either of the City or Santucci. As the City did not appeal from this judgment and as Santucci contends only that the City is liable for all of Walter's damages, we will reverse these judgments and remand for retrial on the issue of Walter's damages.

## Claims IV–V.

We turn finally to the overriding issue on this appeal, the counterclaims of the City and Santucci against each other, with respect to which the jury found against both, that is, the jury considered it a

stand-off. On what basis such a verdict could have been rendered does not appear, the jury being in the fortunate position of not having to state a rational basis for its finding. Santucci argues that the City was negligent in the preparation of the plans and specifications submitted to it (Santucci) and that this was the sole cause of the damage. As hereinbefore stated, the contract between the City and Santucci explicitly exculpated the City in this respect because the information about buildings and existing structures shown on the plan, although believed to be accurate, was not guaranteed, and *Santucci was to satisfy itself as to the character of the ground and the location of all structures encountered in the course of the construction.* Santucci contends it was required to obey and follow these plans and specifications and that the City had the right to order changes in the daily work performed by it (Santucci), which right the City failed to exercise. Bennett, the job engineer for Santucci, testified that the plans did not clearly show the property line or the condition of the east wall of the building; that they showed the east wall by a row of cross hatch marks; that according to the key to the plans, cross hatch marks would indicate that the wall had been completely razed to the ground, when in fact it had been cut down only to the height of one story; and that the plans did not indicate it was a standing common wall. Bennett also testified that the excavation and piling followed the line required by the City's plans and specifications.

Santucci was given specific warning in the contract about the building at 733 West Fulton Street—that it should exercise special care near that building and use such methods as would insure against any movement of earth or settlement of the building foundation. This warning was repeated by the City's employees Grimm and Simpson in conversation with Bennett and Ven-

trella, Santucci's superintendent. The City did not undertake to tell Santucci how to protect the plaintiff's building nor how to install the piling and bracing. By the terms of the agreement, Santucci was to determine the methods to be employed and the procedure to be followed in doing this work. Santucci failed to submit written plans to the City, as required by the contract, as to its method of shoring and bracing. No City employees were used on the project, nor did Simpson as resident engineer for the City, have any direct control over the workers.

Walter's expert witness, structural engineer Frank J. Kornacker, testified that the original sheet piling was insufficient, and that the piling installed after the partial collapse of the wall would have been sufficient, had it been installed initially. He testified that there was nothing in the plans or the specifications which would in his opinion indicate that upon proper excavation, any damage would result to the building.

J. Walter Grimm, the City's assistant chief engineer, testified that in his opinion the shoring and bracing installed by Santucci was inadequate. He further testified that no stop order was given by the City, because it did not want to give Santucci an excuse for claiming overtime pay and for failing to complete the project on schedule.

Ventrella and Bennett both testified for Santucci that in their opinion the shoring and bracing were completely adequate and that the collapse of the wall was due to a loose foundation, soil conditions, and adverse weather conditions. In other words, they argued that no matter what they would have done, the wall would have collapsed. Alternative methods of bracing and shoring the building were suggested on cross-examination, but the use of caissons or round pillars driven into the ground at a point directly below the wall of the building was rejected because in

248

Ventrella's opinion, it would not have prevented the wall and the earth from shifting. He testified there was nothing in the plans or specifications which showed any line or curve where sheet piling should be driven. The use of horizontal beams between the sheet piling on one side of the excavation and the sheet piling on the other side of the excavation of the sewer trench was recommended by Bella Kay's engineer. It was rejected.

"Whalers" (the term used for horizontal steel beams) can be placed against vertically driven sheet piling, in order to hold it rigid, but they could not have been used in the instant case because these pilings were set by Santucci in a curve around the northeast corner of the building. From the engineers' testimony, it is apparent these pilings could have been driven in straight lines so that "Whalers" could have been placed at the back of them. After the wall collapsed and the piling had shifted into the line of the sewer "neck," a new sheet piling was driven which did use "whalers."

There was testimony that soil conditions, the foundation and weather conditions were all to be taken into account in deciding the type of shoring to be used. Ventrella testified that he saw the wall before it collapsed, and Bennett testified that after the sheet piling had been driven, he went inside the building and noticed that the common wall was a free wall which had been bricked to the north wall and a coping placed on top. It is apparent that Santucci was not relying on the City's plans. Even if it had done so, it had notice that a wall was in existence which was not shown on the plans and it therefore should have consulted the City or have attempted to find the razed common wall and taken it into account in its shoring of the building. Examination would have revealed that a razed common wall did not exist, and the most reasonable inference

249

therefore would have been that the cross hatches did not indicate the building wall had been razed, but that it had merely been torn down to a one-story level.

■ It is our conclusion that the City's plans were not intended as a definitive basis on which the work was to be conducted. The only reasonable interpretation of the agreement between the City and Santucci is that the City did not submit its plans as a basis for the literal performance of the work, and that such plans did not excuse the contractor from inquiring into and determining the protection needed for the building at 733 West Fulton Street. The contract and bond specifically placed upon Santucci the obligation to find and determine the shoring necessary for the adjacent structure and to provide all that was necessary to brace and maintain it. Considering that Santucci was specifically warned by the City's employees about the condition of the structure and was put on special notice by the provisions of the contract, there is no basis for the submission of any issue on the City's counterclaim (Claim IV) to a jury. The written agreement between the City and Santucci is explicit in that respect and leaves no room for controversy.

Santucci argues, however, that the City may not recover on its counterclaim (Claim IV) because the jury verdict against the City in Claim IV constitutes a binding determination that the City was negligent and therefore was not entitled to contribution for any portion of its liability to either plaintiff. As hereinbefore set forth, the same jury considered the claims of Walter's against both the City and Santucci (Claims II and III) and the counterclaims of the City and Santucci against each other (Claims IV and V). The finding of the jury in favor of Walter's on both claims, for $6,000 against the City, and for $12,000 against Santucci, and against both the City and Santucci on

250

the counterclaims, makes it obvious that the jury was confused and did not understand the issues.

Santucci argues that the City cannot recover because it was actively negligent in the submission of plans which were inaccurate, and that an indemnitee may not recover against the indemnitor for its own active negligence. In support of its position, Santucci cites Daegling v. Gilmore, 49 Ill 248 (1868); Kaler v. Puget Sound Bridge & Dredge Co., 130 P 894 (Wash 1913); Fitzgibbon v. Western Dredging Co., 117 NW 878 (Iowa 1908). These cases are not in point.

In Daegling v. Gilmore, supra, a property owner sued a subcontractor for damages caused when an adjoining building under construction fell on him and his property. The architect for the building was also the superintendent or general contractor, and the Supreme Court, in reversing and remanding the cause for a new trial for the defendant because of error in the instructions, said the subcontractor could not be held liable for the inherent defects in the plans of the building, but only for his own negligence, except where the plans were so poor, the contractor should have noticed. The case made no mention of active or passive negligence.

In Kaler v. Puget Sound Bridge & Dredge Co., supra, an abutting property owner sued the city and its contractor for damages caused by the overflow of water from low lying land being filled by the city. The plaintiff did not appeal from that portion of the trial court's decree finding the city not liable, and on appeal the court held that the contractor was not negligent and that the city was negligent because of the preparation of faulty plans. The case made no mention of active or passive negligence.

In Fitzgibbon v. Western Dredging Co., supra, the court held only that it was reversible error to instruct the jury that an adjoining landowner could charge a

251

contractor with negligence in failing to intercept and prevent a flow of water on the adjoining property owner's land. There was no allegation of negligence in the preparation of the plans by the board of supervisors of the drainage district and no consideration of active or passive negligence.

■■ We are of the opinion that in the instant case if there was any negligence on the part of the City, it was passive and did not preclude the City from recovering against Santucci. In Illinois a passive tortfeasor may be indemnified by an active tortfeasor under a contract of indemnity. Sack v. Arcole Midwest Corp., 33 Ill App2d 344, 179 NE2d 441. In that case, a subcontractor designed and constructed a scaffold used in the building of a bridge for the Tri-State Tollway. The contractor's field superintendent was on the job site daily to correlate and inspect the work of subcontractors. He was on the scaffold when it was first erected and thought it was of good design and safe. In a suit for injuries sustained by an employee in a fall from the scaffold due to an insecurely fastened hand rail, this court held the subcontractor liable to the contractor under its implied obligation to perform its subcontract with reasonable care, saying, (p 348):

> "Where one does the act which produces the injury and the other does not join the act but is thereby exposed to liability and suffers damage, the latter may recover against the principal delinquent, and the law will inquire into the real delinquency and place the ultimate liability upon him whose fault was the primary cause of the injury. . . . [The subcontractor] designed, erected, maintained and used the scaffold for the performance of the work subcontracted to be done by it. The evidence establishes without contradiction that the defendant was an active tortfeasor while the plaintiffs were passive tortfeasors."

252

Thus in the case at bar Santucci designed, erected, maintained and used the sheet piling adjacent to plaintiffs' building for the performance of the work contracted by Santucci to be done. Although the City's engineer was present daily and even if he were of the opinion that the sheet piling and bracing were adequate, nonetheless, Santucci the contractor who had the responsibility for active performance was the active tortfeasor.

Santucci argues that under Illinois law an indemnity contract will not be construed as indemnifying one against his own negligence, unless such construction is required by the clear and explicit provisions of the contract. It cites Westinghouse Elec. Elevator Co. v. LaSalle Monroe Bldg. Corp., 395 Ill 429, 70 NE2d 604; George Sollitt Const. Co. v. Gateway Erectors, Inc., 260 F2d 165 (7th Cir 1958); Chicago & N. W. Ry. Co. v. Chicago Packaged Fuel Co., 195 F2d 467 (7th Cir 1952). In each of these cases, however, the plaintiff, the one seeking indemnification, was acknowledged to be the only one negligent. Moreover, that Santucci indemnified the City appears to us to be clear and explicit. Santucci argues that the City is not entitled to indemnity from it because there has been no finding that Santucci's negligence was the proximate cause of the damages. It is our opinion that whatever work was done on this project was not done by the City directly, but by Santucci, and it was Santucci, and Santucci alone, which had the responsibility for determining what were the necessary protective measures. Its failure to do so was negligence.

■ While the chancellor had the discretion to direct whether any of the issues in this case should be tried by a jury, it is difficult to understand why he divided the issues. Walter's position was as the lessee of Bella Kay. To have the rights and damages of Bella Kay determined in equity, and the rights of

253

Walter's determined by another court and jury in separate proceedings, complicated and confused the matter. That the result should have been verdicts inconsistent with each other and in some respects with the findings of the chancellor is not surprising. The entire matter should have been disposed of in equity.

We had occasion to consider this in Oppenheimer Bros., Inc. v. Joyce & Co., 20 Ill App2d 34, 154 NE2d 856, where we said, at p 44:

> "The complaint seeks an accounting from defendant Huff with respect to breaches of his fiduciary obligations, and asserts claims against Joyce with respect thereto. Defendants sought to have these issues separated from the principal issue, which has been discussed here, made a jury demand, and sought to have these issues transferred to the law side of the court. Fiduciary obligations are here involved, and it is and should be the purpose of equity to administer complete relief in one suit. Where equity has acquired jurisdiction for the purpose of administering equitable relief, it may determine all matters at issue, although by so doing it may grant legal rights and establish legal remedies at the same time. McIntyre v. McIntyre, 287 Ill 544, 550 (1919); Keith v. Henkleman, 173 Ill 137, 141 (1898). This matter should be completely disposed of in chancery, where unquestionably such issues can receive a more expeditious and less cumbersome hearing than would be involved in presenting the issues to a law court."

The solution of the issues has been made exceptionally difficult by the commingling of law and equity procedures. If any of the parties involved makes a motion to that effect, the chancellor should vacate the order of transfer.

The decree insofar as it finds in favor of Bella Kay and against the City of Chicago is affirmed.

The judgments in favor of Walter's and against the City of Chicago and Santucci are reversed and the cause is remanded for a trial of the issue of damages only.

The judgment on the counterclaim of the City of Chicago against Santucci is reversed and the cause is remanded with directions to allow the motion of the City of Chicago for judgment notwithstanding the verdict on its counterclaim against Santucci for the amount awarded to Bella Kay and for such damages as may hereafter be awarded to Walter's.

The judgment denying the counterclaim of Santucci against the City of Chicago is affirmed.

Such other and further proceedings may be taken as are not inconsistent with the views herein expressed.

Affirmed in part; reversed in part; and cause remanded with directions.

DEMPSEY, P. J. and SULLIVAN, J., concur.