Wilbur C. Summers and Jewell E. Summers, Plaintiffs-Appellees, v. Northern Illinois Gas Company, a Corporation, Defendant-Appellant.

Gen. No. 53,056.

First District, Second Division.

November 25, 1969.

Robert H. Joyce, Raymond J. Kelly, George E. Preonas, Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant.

Nathan G. Brenner, Jr., Goldenson, Kiesler, Berman & Brenner, of Chicago (William Elman, Elman and Ehardt, of counsel), for appellees.

MR. PRESIDING JUSTICE LYONS delivered the opinion of the court.

The defendant corporation, Northern Illinois Gas Company, appeals from a final judgment, entered on a jury verdict, in favor of the plaintiffs, Wilbur C. Summers and Jewell E. Summers, his wife, in the sum of $8,200. In this appeal, it contends that the trial court erred in allowing the case to be submitted to the jury on a res ipsa loquitur theory and in giving the jury certain instructions tendered by the plaintiffs. The defendant corporation also urges that the evidence does not support a finding of liability against it.

The plaintiffs brought this suit for the property damage resulting from a fire, allegedly gas-fed, in their two-story frame dwelling located in Steger, Illinois. No one was injured. The complaint contained two counts pleaded in the alternative. Count I was based upon a res ipsa loquitur theory and contained a general allegation of negligence based upon the defendant corporation's exclusive possession and control of the southeast corner of the basement wherein certain gas transmission lines, pipes and meters owned and maintained by the defendant corporation were located and wherein on March 2, 1962, a fire began which was communicated to the upper floors of the residence causing property damage to be sustained. Count II of the complaint contained five specific acts of negligence allegedly committed by the defendant corporation.

In its answer, the defendant corporation admitted that it owned, operated and maintained certain gas transmission lines or pipes and gas meters in that portion of the basement as alleged by the plaintiffs but denied that it was guilty of any negligence and that its gas was highly inflammable, combustible and explosive.

Eleven witnesses testified for the plaintiffs, nine of whom are important for the issues raised by this appeal. Two were occurrence witnesses, two were adverse witnesses employed by the defendant corporation, and

one was an expert witness. Five witnesses testified for the defendant corporation, all employees of the defendant. At the close of the evidence presented by the plaintiffs, the trial court sustained the motion of the defendant corporation and struck count II of the complaint for failure of proof. The plaintiffs have not cross-appealed from that ruling. Only the res ipsa loquitur theory of the complaint and the accompanying evidence are before this court.

The two occurrence witnesses were the coplaintiff, Jewell E. Summers, and her daughter, Deborah. Deborah, who was sixteen at the time of the trial and ten when the fire occurred, testified that on March 2, 1962, two employees of the defendant corporation arrived shortly after lunch and left at approximately 2:30 p. m. after working in the basement for about an hour; that at approximately 4:00 p. m. on March 2, 1962, she smelled smoke and informed her mother, who checked the food which was cooking in the kitchen but noticed nothing unusual; that she then said she smelled gas whereupon her mother entered the dining room and, looking into the living room, saw flames shooting up; that Deborah also looked into the living room and saw flames shooting up from the southeast corner of the room at a height of approximately one foot from the floor; and that the fire was limited to this area. Deborah also stated that she was home all day on March 2, 1962, and no one was in the basement that day except the employees of the defendant corporation; that the basement was unfurnished and was completely vacant in the southeast corner. Nothing was stored there. There was vertical shelving but it did not extend to the southeast corner. In conclusion, Deborah testified that when she last went into the basement quite some time before the fire occurred, she did not smell any gas there.

Mrs. Jewell E. Summers testified that she and her husband had purchased their home in 1960; that in

August or September, 1960, her husband had installed a new gas furnace and new hot water heater in their residence, placing them in the center of the basement; that the family had occasion to use these fixtures for over a year and never had any trouble with them; and that she never smelled an odor of gas in their home from the time they moved in until the fire occurred. She and her husband also remodeled their attic by raising the roof and converting the attic into a five-room second floor apartment. Her husband then wanted a new gas meter installed in the basement which would be used by the second floor tenants. She called the defendant gas company and on March 2, 1962, between 1:00 and 1:30 p. m., two employees arrived at her home to install this new meter.

Mrs. Summers admitted the two men into the basement and left them there to work as she returned upstairs to rejoin her daughter and her parents who were visiting that day. She did not see or hear the men depart after finishing their work in the basement. They did not say they were leaving. Her parents left about 3:00 p. m. On March 2, 1962, neither her parents nor any member of her family were in the basement. Only the two men employed by the defendant corporation were in the basement on that day.

Mrs. Summers substantially corroborated the testimony of her daughter regarding the fire which she saw in the living room at about 4:00 p. m. The flames were limited to the southeast corner of the living room and seemed to be coming from the basement. After calling the fire department, Mrs. Summers ran down the basement steps, looked into the basement, and saw the fire in the southeast corner. The flames were touching the ceiling. Mrs. Summers also said that the flames seemed to begin at the gas meters and the fire looked as if it was coming out of the meters. She saw this within two minutes after seeing the fire in the living room.

The fire department arrived fifteen minutes later. In conclusion, Mrs. Summers testified that she heard no explosion before she saw the flames in the living room; that she was smoking on the day of the fire but only in the dining room and not in the front room; and that her parents also smoked.

Henry P. Martin testified that on March 2, 1962, he was a member of the Steger volunteer fire department and arrived at the Summers' home shortly after 4:00 p. m.; that the fire was then in progress; that after fighting it from the outside of the house, he and some of his co-workers made a foot-long hole in the front of the home in the southwest corner, put a hose line in the walling, and directed water upward to put out the smoke. The fire was extinguished in about thirty minutes. He went into the inside of the house and noticed that the living room was the most charred room in the home.

The parents of Mrs. Summers, Mr. and Mrs. Earl Davis, both testified that they did not go into the basement on March 2, 1962, and that the employees of the defendant corporation arrived at around 1:00 p. m. on that date but they did not know when these men left. The Davises also stated that they left their daughter's home at around 3:00 p. m.; that they both smoked on that day but only in the dining room where the television set was located and not in the living room; and that when they left they did not smell any gas or smoke nor did they see any fire. Mrs. Davis stated that she washed clothes in her daughter's basement on the day before the fire and was in the basement for about three hours on that day but did not smell any gas.

The other coplaintiff in this case, Wilbur Summers, testified that he had, in 1960, personally installed the gas furnace and hot water heater, placing them in the center of the basement, as well as the gas line which ran from these fixtures to the gas meter located in the

southeast corner; that he could not recall if he or the defendant gas company had connected this gas line to the gas meter but that the gas company had checked the line after he had installed it and before they turned on the new gas furnace; that he had never detected an odor of gas in the basement from the time he installed the line in 1960 to the day of the fire in 1962; and that he never had any trouble with the gas furnace or hot water heater and that, after the fire, these fixtures did not lose their utility but rather only sustained smoke and water damage.

Mr. Summers also stated that he arrived home on March 2, 1962, at 4:15 p. m.; that he saw smoke coming from only the front end of the house at the southeast corner; that the fire was extinguished by about 4:30 p. m.; that representatives of the defendant corporation were present by then with two or three trucks and three or four cars; and that these men seemed to be working in front of his home. In conclusion, Mr. Summers testified that he went into his basement shortly after the fire was extinguished and both gas meters were gone. There was no fire damage in the area of the basement where he had installed the gas fuel line. He did not have to repair any floor joists in this area either.

The two adverse witnesses called by the plaintiffs were Earle Porter, a meter inspector for the defendant corporation on the day of the fire, and Robert Schnare, division construction manager for the Eastern division of the defendant corporation. Both men were present at the scene of the fire after it had been extinguished. Porter testified that he saw another employee, Richard Yost, remove the gas meters and regulator from the basement and put them into the back of his truck to be returned to the defendant's shop. Porter never saw this equipment again. He was in the basement after the fire and, along with Yost, conducted an air test of that portion of the gas fuel line belonging to the plaintiffs

131

and not to the defendant corporation. Yost attached a testing device to the opening of the customers' fuel line and used an air pump to fill this pipe with eight pounds of air pressure. Porter thereafter saw the gauge go down to zero indicating that the Summers' fuel line did not hold air.

Porter went on to state that the defendant corporation owned a gas main located in the street adjacent to the plaintiffs' residence; that the gas in this main was under a pressure of twenty pounds per square inch; that the gas was transmitted from there to the Summers' residence and their gas meters by means of a ¾″ underground service pipe which entered their home through the southeast corner of the basement wall; that inside the basement was located a ¾″ valve, a regulator, some pipe fittings, and the meters; and that the purpose of the regulator is to reduce the gas pressure from twenty pounds per square inch to ¼ pound per square inch, which latter pressure then moves through the meter and into the fuel lines owned by the customer.

Robert Schnare testified that the defendant corporation furnished natural gas to the plaintiffs' home; that this gas was lighter than air and would rise if exposed to air; that he arrived on the scene later than 5:00 p. m. on March 2, 1962, after the fire department had left; that he observed an air test being conducted by employees of the defendant corporation on the defendant's gas service line running underground from the gas main in the street to the Summers' residence; and that air was pumped into the pipe to a weight of ninety-five to one hundred pounds, but the air pressure started to fall off, indicating a leak in the defendant corporation's gas service line located outside the house. He also observed Porter and Yost in the basement testing the plaintiffs' fuel line. It also did not hold air pressure, indicating a leak therein. Soap suds were put on two fittings found on the plaintiffs' piping and air bubbles

appeared which was another indication of an air leak in the plaintiffs' fuel line. When Schnare looked into the southeast corner of the basement, he saw that the gas meters were gone.

Gerald Maatman, an expert witness, testified for the plaintiffs. He was a graduate of the Illinois Institute of Technology, with a degree in Fire Prevention and Safety Engineering. During the time he was employed as an assistant chief engineer of the Illinois Inspection Bureau, a fire insurance rating bureau, for nine years and later as a professor and director of the Department of Fire Protection at the Illinois Institute of Technology for seven years, he had examined several buildings while conducting fire loss investigations attempting to determine the cause of a given fire. He had examined the Summers' residence in July, 1962, and saw fire damage in the southeast corner of the living room as well as in the same corner of the basement. The fire damage in the basement was confined almost entirely to the southeast corner which was directly below that portion of the living room which had been damaged. The basement ceiling studs which supported the living room floor were heavily charred on the bottom in this corner of the basement as were the floor boards and joists.

Maatman also examined the gas furnace and hot water heater but found no structural damage, as well as no damage to the ceiling joists located above these fixtures. He testified that natural gas is not subject to spontaneous combustion but must be ignited. Ignition of natural gas is possible without an explosion, given the proper volume of air and gas. In response to a lengthy hypothetical question, Maatman offered his opinion that the fire originated in the southeast corner of the basement, within two to three feet of the ceiling, and burned upward. This opinion was based upon the physical evidence of fire damage which was concentrated in one corner of the basement and consisted of the

charring and blackening of the bottom side of the ceiling joists and floor board in this area. Due to this physical evidence, he said it was also impossible that the fire could have started in the living room and traveled downward. In such an event the floor joists would have been consumed. In this case the joists were intact and charred only on the bottom. In conclusion, Maatman testified that fuel for the fire could not have come from any leak in that portion of the gas fuel line owned by the Summers because there was no trail of fire damage back to this area and there was no heavy charring in the area immediately above this fuel line.

The two employees who installed the additional gas meter, Richard Reichert and James Walters, testified for the defendant corporation. Both said they arrived at around 1:00 p. m. and left an hour later. During the time they were in the basement, they both used wrenches in turning off and later turning on the gas valve located on the fuel line belonging to the defendant corporation. Reichert twice used a wrench in working on the plaintiffs' gas fuel line; first, when breaking the fitting which held the old meter bar and then later when tightening the new meter bar thereby solidifying the union of the two meters to the regulator. After the meters were installed, they were connected with the fuel line belonging to the Summers which began at the meter. The men then tested their work by applying a sponge, containing soap and water, to all the fittings or connections which they had just completed. No gas bubbles appeared indicating no gas leaks in the fuel line. Reichert could not remember if he smoked on that day. He also did not recall the specific location of the gas meters in the basement. Walters testified that he never smoked and that the regulator was working properly. Everything seemed to be proper when they left.

The remaining witnesses for the defendant corporation were Richard Yost, Edward Houwing, and Robert

Schnare. Yost was a fitter on the day of the fire and was at the Summers' home from 4:15 p. m. to 7:30 p. m. He turned off the gas valve in the basement at approximately 4:45 p. m. and noticed that the meters were still in place although burned and blackened from the fire. Yost removed the meters and the regulator from the southeast corner of the basement, took them back to the office in his truck, but did not know what later happened to them. He also capped the gas lines in the basement and put an air pressure test on the lines owned by the Summers. This test indicated that the plaintiffs' gas lines were not leaking.

Houwing was a crew leader, maintenance department, for the defendant corporation on the day of the fire. He arrived at 5:00 p. m. and conducted bar hole tests outside the Summers' home in the area of the gas main and the gas service lines running underground from the main to the plaintiffs' basement. All of this piping was owned by the defendant corporation. A bar hole test consists of making borings in the ground to an approximate depth of three feet and by the use of a hose, bulb and hollow rod removing a sample to see if any gas is thereby taken from the ground. Houwing testified that his tests indicated there was no gas in the ground in the area where he made his borings. He also performed an air test on the gas service lines owned by the defendant corporation which lead from the gas main to the Summers' basement. Since the gauge on the testing device went down from the 100 lb. per square inch pressure, this indicated an air leak in this section of piping. He could not determine its location, however.

Robert Schnare stated that he observed other employees of the defendant corporation conducting bar hole tests, the results of which indicated there was no gas in the ground. He did not know what became of the two meters removed from the plaintiffs' basement and did not know if the defendant corporation kept records

showing the results of its later physical examination of these meters. He never saw such a record.

Initially, the defendant corporation contends that the trial court erred in allowing this case to go to the jury on a res ipsa loquitur theory in that the plaintiffs failed to prove the instrumentality which caused the property damage. It is urged that the doctrine of res ipsa loquitur was used not to properly support an inference of negligence once the known instrumentality producing injury or damage is known, but was improperly used to infer the instrumentality which caused the property damage thereby misleading the jury. It is contended that the doctrine was erroneously employed to infer the fundamental or foundation fact of causation as the plaintiffs did not independently prove it.

A mystery in this case is the source of the fire's ignition and who was responsible for it. Both parties to the litigation recognize that gas leaking in or into the basement and existing prior to ignition due to the gas company's negligence would be a concurrent cause of the resulting property damage. The defendant corporation contends, however, that the res ipsa loquitur doctrine was erroneously used to supply an inference that the concurrent cause of the fire was a gas leak in property owned and maintained by it although this was not known as a foundation fact. It is urged that because the plaintiffs failed to prove causation, the res ipsa loquitur inference of negligence was inapplicable.

■ ■ Such an argument tends to overlook the persuasiveness of the evidence presented by the plaintiffs and the rule that res ipsa loquitur is but one aspect of circumstantial evidence. Erckman v. Northern Illinois Gas Co., 61 Ill App2d 137, 210 NE2d 42 (1965); May v. Columbian Rope Co., 40 Ill App2d 264, 189 NE 2d 394 (1963). The nature of this case required the plaintiffs to rely upon circumstantial evidence. They had

no direct evidence of what started or fed the fire which caused the ultimate property damage. We are of the opinion that they presented sufficient facts in support of their complaint to create a rebuttable presumption of negligence against the defendant corporation and that the trial court did not err in submitting the case to the jury on this theory. The evidence presented by the plaintiffs showed: (1) two employees of the defendant corporation had worked in the basement on the day of the fire and left approximately two hours before the fire was seen; (2) these men were installing an additional gas meter in the southeast corner of the basement and were loosening and tightening gas line connections throughout the basement; (3) they were the only people shown to be in the basement that day; (4) the fire was limited to the southeast corner of the house and, according to the opinion of an expert witness, began in the southeast corner of the basement; (5) Mrs. Davis testified that she had been down in the basement on the day prior to the fire and detected no odor of gas there; (6) other members of the Summers family testified they smelled no odor of gas in the time they lived in the house prior to the fire; (7) Deborah Summers smelled gas after stating she smelled smoke; (8) after seeing that Deborah left the house, Mrs. Summers went down to the basement and looking in, saw a fire in the southeast corner; (9) the flames seemed to begin at the gas meters with the fire looking as if it was coming out of the meters; (10) there was no readily combustible material located in the southeast corner of the basement. Although there was no explosion, an expert witness testified that ignition of natural gas would be possible without an explosion given the proper volume of air and gas. His testimony was not disputed nor refuted. From a totality of these circumstances, we are of the opinion that the plaintiffs, by circumstantial evi-

dence, presented the issue of causation to the jury. The evidence, if believed, amply supported a reasonable inference that the instrumentality causing the property damage was defective gas transmission pipes and gas meters owned and maintained by the defendant corporation and located in the southeast corner of the basement. This inference of general negligence did not vanish when the defendant corporation presented its contrary evidence but rather all of the evidence remained to be weighed by the jury. Metz v. Central Illinois Elec. and Gas Co., 32 Ill2d 446, 449, 207 NE2d 305, 307 (1965).

It is also urged that res ipsa loquitur does not apply to this case because a fire is the kind of accident that could occur without negligence. This argument overlooks the fact that the plaintiffs did not solely rely upon the occurrence of the fire to establish their cause of action but rather offered many additional evidentiary facts in presenting their prima facie case. The totality of these facts, if believed, supported a reasonable inference of negligence as alleged in the complaint. We find that the trial court did not err in submitting this case to the jury on a res ipsa loquitur theory.

■ The defendant corporation contends that the trial court erred in giving, over its objection, three jury instructions tendered by the plaintiffs. The first instruction complained of had to do with res ipsa loquitur as applied to the facts of this case and included the following wording: "That the damage was received from a fire originating in the area of the basement where defendant's gas service system equipment and associated piping was located which was under the defendant's control." The defendant corporation urges that the use of such wording is reversible error because it does not contain the name of the instrumentality causing the injury and because it directed a verdict for the plaintiffs if

the jury found that the fire originated in the southeast corner of the basement without any mention of a pre-existing gas leak. We are not persuaded by this argument in that the next portion of the instruction complained of informed the jury that they were to be concerned with the defendant corporation's conduct as to its gas pipes and equipment and another instruction in the series given stated: "If you find the plaintiffs were not guilty of any contributory negligence, and you find that gas was present on plaintiffs' premises because of defendant's negligence as charged, although the immediate cause of the fire was ignition, the defendant is liable for damages from the fire." The instructions taken as a series did not direct a verdict for the plaintiffs but accurately informed the jury of the law pertaining to this case.

■ ■ The defendant corporation also urges that two other jury instructions were prejudicial and confusing because they were based upon specific acts of negligence although count II of the complaint, alleging specific negligent acts, had been stricken by the court earlier in the trial. The only alleged mention of specific acts of negligence in these two instructions is "that the defendant acted, or failed to act in one of the ways claimed by the plaintiffs" and "that gas was present on plaintiffs' premises because of defendant's negligence as charged." Within the facts of this case, we find no error in the use of such wording. The wording in the latter instruction is not error because a res ipsa loquitur complaint, like a specific negligence complaint, charges negligence. The wording in the former instruction is likewise not error because the entire portion of the instruction reads: "Second, that the defendant acted, or failed to act in one of the ways claimed by the plaintiffs *as stated to you in these instructions* and that in so

acting, or failing to act, the defendant was negligent." (Emphasis supplied.) No error occurred in the giving of these instructions.

 Finally, the defendant corporation contends that there was insufficient evidence to establish its liability. It urges that because the evidence showed there was no gas leak prior to the fire, it was entitled to a directed verdict at the close of all the evidence. We do not agree with this contention. The circumstantial evidence presented by the plaintiffs, if believed by the jury, was sufficient to reasonably support its verdict. The defendant corporation presented extensive evidence in an attempt to show that it was free from negligence with regard to the gas piping and that the property damage was caused by smoking in the rooms on the first floor above the basement or by the shelving in the basement catching on fire or by a leak in the Summers' gas fuel line or by a defect in the fixtures installed by Mr. Summers in his basement. This conflict in the evidence was for the jury to resolve based upon its assessment of the credibility of the witnesses and the weight to be given their testimony. Within the facts of this case, we cannot say that all of the evidence, when viewed in its aspect most favorable to the plaintiffs, so overwhelmingly favored the defendant corporation that no contrary verdict based on that evidence could ever stand. Pedrick v. Peoria & Eastern R. Co., 37 Ill2d 494, 510, 229 NE2d 504, 513 (1967).

The judgment is affirmed.

Judgment affirmed.

BURKE and McCORMICK, JJ., concur.