DELBERT MARLER, Plaintiff-Appellant, *v.* MOULTRIE-SHELBY FARM SERVICE *et al.*, Defendants—(MOULTRIE-SHELBY FARM SERVICE, Defendant-Appellee.)

(No. 11752;

Fourth District—April 26, 1973.

CRAVEN, P. J., concurring in part and dissenting in part.

Rosenberg, Rosenberg, Bickes & Johnson, of Decatur, (Wayne L. Bickes, David L. Johnson, of counsel,) for appellant.

Wilson, Dyar, Houchen & McDonald, of Decatur, (Vernon H. Houchen, of counsel,) for appellee.

Mr. JUSTICE SMITH delivered the opinion of the court:

The circuit court of Macon County directed verdicts at the close of the plaintiff's evidence in favor of the three defendants. Defendant Goodrich was an employee of NRG Fuels Corporation and they were charged in the trial court with the failure to properly inspect and repair propane gas lines running from a tank into the basement of the house where a gas explosion occurred. The plaintiff does not appeal from the directed verdicts as to these two defendants.

The Moultrie-Shelby Farm Service, referred to hereinafter as FS, is charged with two items of negligence: (1) with the negligent installation of copper tubing running from an outside propane gas tank through the walls of the basement and (2) with the failure to odorize the propane gas. The property was owned by church trustees and was rented by them to the plaintiff and his wife at the time of the explosion. The husband went down into the basement when they moved in on August 11, 1969, to light the hot water heater and the explosion in question occurred. The plaintiff sustained severe burns and permanent injuries.

The church trustees had contracted with FS in 1965 to install a liquid propane gas system on the property. The installation consisted of a 500-gallon propane gas tank behind the house and a copper line transmitting the propane from the tank through a low pressure regulator and then through the foundation of the house into the basement. The foundation was composed of brick and mortar and the outside had been stuccoed. The tubing apparently went through the stucco and between two bricks at the mortar joint. The plaintiff testified that he turned on the gas at the tank and then lighted all four burners on their kitchen gas stove. At that time neither he nor his wife observed any odor of any kind. He then went down into the basement and pulled the switch to light the electric water heater. There was a spark, a flash and an explosion

and his next recollection is awakening in the hospital. The premises in question had been vacant since June of the same year.

The preceding tenants had last purchased 100 gallons of propane from FS in May of the same year. During the preceding fall, they had had the other two defendants inspect the gas lines because of an odor in the house, and testified that that odor continued while they were there. There is evidence that there had been some sewer disturbance and the failure of the sewer in the house to function properly. The trustees had worked on this problem in the spring before the explosion. In the preceding fall, defendant Goodrich inspected the gas lines and pronounced them o.k. He testified that he did not examine the line through the foundation because it could not be seen or reached. Why he did not detect the odor of gas at the time of the inspection, or why the gas didn't previously explode when the electric water heater was on is unexplained in this record.

Immediately following the explosion, the trustees of the church came out and removed a piece of copper tubing some 4 to 6 inches long which had been in the foundation. This tubing was corroded and eaten away, leaving holes in it.

The uncontroverted testimony is that FS supplied the propane from some time in the preceding October and had installed the system in 1965. FS was never called in to inspect the lines nor is it charged with any failure to properly maintain the lines after the gas enters the residence. Goodrich testified that the previous tenants had asked his company to inspect the gas line and its joints, and this he had done in accordance with the usual practice, but had not inspected this particular portion of the copper tubing because it was hidden by the foundation. He tightened up some joints and testified that he came to the conclusion that the gas which the tenants had smelled in the basement was sewer gas. The tenants testified they had smelled either sewer gas or gas during this period, but did not know which.

The manager of the defendant NRG Fuels Corporation testified that he had been in the business for about 12 years and had occasion to observe copper pipe through mortar and cement and stated "I have seen some copper eaten up by corrosion. There is a customary or practical way of avoiding this sort of thing in the business, that is, to put a piece of pipe on a sleeve, or wrap the copper where it goes through the foundation". On cross-examination, he stated "I have seen installations where there was no sleeve involved and it ran through brick or cement. I have seen installations where the copper was not corroded in those situations. As to whether it is certain kinds of cement that will corrode or eat up a copper tubing, I couldn't answer that because I don't know.

I don't know whether it is a particular kind of mortar or whether all mortar reacts the same way". This is the sum total of any testimony about custom in the installation of this type of tubing. This evidence is significant by the absence of what it says rather than otherwise. There is no evidence that this custom existed at the time of the installation. There is no evidence that failure to sleeve or wrap the tubing *per se* caused the corrosion. The testimony is that sometimes it does and sometimes it doesn't. There is no evidence to indicate whether the lines at the point of its failure belonged to the property owner or to the defendant. Can it be said that it is the duty of this defendant who was delivering gas to the household to examine, maintain and correct all of the inside installations affecting the system? We think not. In *Clare v. Bond County Gas Co.,* 356 Ill. 241, 244, 190 N.E. 278, the court stated:

> "In the absence of notice of defects, it is not incumbent upon a gas company to exercise reasonable care to ascertain whether or not service pipes under the control of the property owner or the consumer are fit for the furnishing of gas. As a general proposition, a person's duty can extend no further than its right, power and authority to carry it out. It cannot be seriously urged that the employees of the gas company have the right to go upon the premises of one of its customers for the purpose of inspecting his pipes or other fixtures except upon the invitation, license or permission of the owner."

In *Summers v. Northern Illinois Gas Co.,* 117 Ill.App.2d 125, 253 N.E.2d 881, it appears that the instrumentality causing the property damage was defective gas transmission pipes and gas meters owned and maintained by the defendant in that case. There is no such evidence in this record. Nowhere does it appear that FS owned the internal gas transmission system, the gas appliances or had any control over them.

■■ A custom or usage to become binding upon the parties must have antiquity as well as uniformity and universality and have continued for a sufficient length of time that the parties must have contracted in relation to it. (*F. B. Miller Agency v. Home Insurance Co.,* 276 Ill.App. 418, 427.) It should generally be established by more than one witness so as to raise a presumption that others knew it or should have known it. (*Traff v. Fabro,* 337 Ill.App. 83, 84 N.E.2d 874.) The evidence of the plaintiff is wholly insufficient to establish that it was the custom to sleeve the pipe. (*Hardman v. Helene Curtis Industries,* 48 Ill.App.2d 42, N.E.2d 681; *Wilke Metal Products, Inc. v. David Architectural Metals, Inc.,* 92 Ill.App.2d 265, 236 N.E.2d 303.) Under these circumstances, we find it difficult to find any evidence to support a duty on the defendant to maintain the line or any evidence to establish a custom followed at the

time of the installation with reference to sleeving or wrapping a copper pipe when it goes through a foundation from which a duty would arise. It is pure speculation. Thus the trial court correctly directed a verdict on the issue of installation.

■■ · The second point is whether or not the defendant filled the tank with non-odorized or insufficiently odorized gas, when by the exercise of ordinary care the defendant knew or should have known that this gas. could not be detected by the plaintiff or any other person upon said premises without odorization. Defendant's gas department manager testified as an adverse witness under Ill. Rev. Stat. 1969, ch. 110A, par. 60, and among other things as abstracted stated: "When we get propane, we buy it in bulk. We do not have the odorizer ourselves. It is added at the point of pick-up, at the terminal where it comes from. Our immediate supplier is ·supposed to odorize the gas. We do not perform any test to see that it is odorized". None of the witnesses testified that they at any time smelled the odor of propane gas. While this is negative testimony, its weight and credibility are for the determination of the jury. (*Hulke v. International Mfg. Co.*, 14 Ill.App.2d 5, 142 N.E.2d 717; *McDaniels v. Terminal R Ass'n of · St. Louis*, 302 Ill.App. 332, 23 N.E.2d 785.) In *McDaniels*, at p. 352, the court stated: "While negative testimony may not be of as much weight as positive testimony, the weight and credibility of both are for the determination of the jury. (*Noonan v. Maus*, 197 Ill. App. 103.)" We would also observe that Goodrich was familiar with the odor of propane gas and smelled none. The plaintiff smelled none. The previous tenants smelled some kind of gas and didn't know what it was. Such testimony does have probative value on the issue as to whether or not the defendant in this case supplied ·this consumer with propane gas which had been properly treated with a malodorant sufficient in quantity to warn people of its existence. The record here shows that so far as this defendant was concerned, they bought the gas supposedly already sufficiently treated. They delivered the gas. By such action they uncategorically represented that the gas was fit and safe for use in gas appliances. In *Hulke*, the defendant Skelly was held liable as a producer of a dangerous commodity on the theory that with an inherently or intrinsically dangerous substance Skelly could not escape liability or evade it by employing an independent contractor to do it. In this state, "Gas is a dangerous commodity, and the corporation which undertakes to furnish such service must exercise a degree of care commensurate to the danger which it is its duty to avoid and must use every reasonable precaution in guarding against injury to the person or property of other". (*Metz v. Central Illinois Electric & Gas Co.*, 32 Ill.2d 446, 207 N.E.2d 305.) We cannot say as a matter of law that the defen-

dant in this case fulfilled its duty and that whether or not the propane gas was sufficiently odorized to be safe is a question of fact for a jury determination. If the supplier did odorize the gas, the question yet remains whether or not it was sufficiently odorized to warn ordinary people of its presence. Accordingly, the judgment of the circuit court is affirmed as to negligent installation and the cause is reversed and remanded to the trial court on the issue of a failure to odorize or cause to be odorized.

Judgment affirmed in part; reversed and remanded in part.

TRAPP, J., concurs.

Mr. PRESIDING JUSTICE CRAVEN concurring in part and dissenting in part:

The question of whether the defendant fulfilled its duty and whether or not the propane gas was sufficiently odorized so as to be safe was a question of fact for the jury. Thus, I agree with that portion of the majority opinion that so holds.

Upon this record, the issue of negligent installation of the gasline was also a question of fact for the jury, and I would reverse and remand upon that issue.

The complaint alleged that the defendant installed the tank and the connecting line in 1965. The connecting line was inserted through the foundation and, as the majority notes, apparently went through the stucco and two bricks at the mortar joint. This distribution line, or tubing, was not protected by a noncorrosive sleeve. The tubing thus installed was corroded, leaving holes through which the gas could and did leak into the basement. The complaint alleges that the corrosion was caused by the combination of mortar and corrosive elements contained in the cement and mortar surrounding the tubing. The answer essentially admits the foregoing allegations; and as to the allegation with reference to the cause of the corrosion, the answer admits the allegation but "affirmatively states that the corrosion was not caused by any act or doing of this defendant".

Thus, upon the pleadings, it seems to me that the majority opinion requires proof of admitted facts. The defendant in this case is charged with negligent *installation*, not merely failure to inspect the tank and distribution system. The allegations and admissions aided by the testimony of the witness Richard Short were sufficient to establish negligent installation and a breach of the required duty, at least such was sufficient to constitute an issue of fact for the jury.

The witness Short who had been in the business of sale and installation of propane facilities in the area for 12 years testified with reference

to the manner of installation and the cause of corrosion. His testimony as abstracted reads:

> "In the usual course of our business our company installs propane tanks and lines and all. I have been engaged in the part of the business that concerns the installation of propane lines and facilities for approximately 12 years. During this time I have had occasion to observe copper pipes put through mortar and cement. With reference to what I have noticed about any of these installations with regard to corrosion, I have seen some copper eaten up by corrosion.
>
> There is a customary or practical way of avoiding this sort of thing in the business. That is to put a piece of pipe on a sleeve, or wrap the copper where it goes through the foundation.
>
> I have seen installations where there was no sleeve involved and it ran through brick or cement. I have seen installations where the copper was not corroded in those situations. As to whether it is only certain kinds of cement that will corrode or eat up a copper tubing, I couldn't answer that because I don't know. I don't know whether it's a particular kind of mortar or whether all mortar reacts the same way."

In this state, as the majority opinion notes, gas is a dangerous commodity and those who undertake to furnish service, whether installation of facilities or distribution of gas, must exercise a degree of care commensurate with the danger. This the defendant did not do. Accordingly, I dissent from that portion of the majority opinion that affirms a directed verdict on negligent installation issue.