JOSEPH O. DAUGHERTY, SR., Plaintiff-Appellant, v. MARY D. BURNS, Indiv., as Ex'x of the Estate of Joseph S. Daugherty, Deceased, and as Trustee, *et al.*, Defendants-Appellees.

Fourth District    No. 4—01—0795

Argued April 16, 2002.—Opinion filed May 17, 2002.—Rehearing denied July 17, 2002.

James L. Ayers (argued), of Shonkwiler, Ayers & Rhoades, of Monticello, for appellant.

R. Kurt Wilke (argued) and Matthew J. Cate, both of Barber, Segatto, Hoffee & Hines, of Springfield, for appellees.

JUSTICE KNECHT delivered the opinion of the court:
Plaintiff, Joseph O. Daugherty, Sr., is the tenant farmer under oral crop-share leases on three tracts of land in Piatt and Douglas Coun-

ties. He is also a joint owner of all three tracts, owning less than a majority interest in each. Defendants Mary Burns and James Daugherty, plaintiff's sister and brother, are joint owners with plaintiff of all three tracts. Their mother's sister, defendant Helen Short, is a joint owner with them of one tract. Their father's sister, Grace Dye, who is not a party to this action, is a joint owner with them of another tract. On October 22, 1999, defendants served plaintiff with notice to terminate all three leases. They also filed an action seeking to partition the three farms. In March 2000, with defendants' partition action pending, plaintiff brought an action seeking a declaratory judgment he was entitled to remain in possession of the three farms under the oral leases until partition. In July 2001, the trial court ruled in defendants' favor. Plaintiff appeals, arguing (1) defendants lacked the power to terminate his tenancy absent the consent of all joint owners, and (2) their notice to terminate was ineffective because it was not served more than four months prior to the end of the lease as required by statute. See 735 ILCS 5/9—206 (West 1998). We affirm.

## I. BACKGROUND

Plaintiff, defendants, and Grace Dye are joint owners of three tracts of farmland in Piatt and Douglas Counties. They acquired their interests through inheritance or grants from family members.

Plaintiff began farming the first of the three tracts, known as Farm No. 1167, in 1977. Farm No. 1167 includes 400 acres in Piatt County (where plaintiff resides) and 151 acres in Douglas County. At that time, plaintiff's mother, Ruth Daugherty, and her sister, defendant Helen Short, each owned an undivided one-half interest in the land and plaintiff was merely a tenant farmer. After Ruth Daugherty died, plaintiff and his brother and sister acquired her interest in the farm. Helen Short deeded portions of her interest to her husband, William V. Short, who died in 1999, and both purported to transfer their interests into living trusts. Currently, Helen Short, individually or through the William and Helen Short Trusts, owns an undivided one-half interest in Farm No. 1167, while plaintiff and his two siblings each own undivided one-sixth interests.

Plaintiff began farming Farm No. 1738, consisting of 53.3 acres in Piatt County, in 1988. He and defendants Mary Burns and James Daugherty each own an undivided one-third interest in this land. He began farming Farm No. 1001, consisting of 320 acres in Piatt County, in 1990. Although plaintiff farms Farm No. 1001 as a single unit, it is divided into 40-acre and 80-acre tracts, each of which is owned by plaintiff, Mary Burns, James Daugherty, and Grace Dye (their father's sister) in varying proportions. Grace Dye owns a 100% interest in one

40-acre tract. Mary Burns and James Daugherty together own a majority interest in Farm No. 1001.

Plaintiff does not have written leases for any of the three farms. The terms of the three oral crop-share leases are essentially identical. Plaintiff, as tenant farmer, provides all farming equipment and labor. The landowners, including plaintiff, pay the property tax on the land and supply the limestone and half the cost of seed, herbicide, and fertilizer in proportion to their interest in the land. Plaintiff, as tenant farmer, receives half the proceeds from sale of the crops; the parties divide the other half among the landowners, including plaintiff, in proportion to their ownership interests. The parties have always settled their financial accounts involving the three farms around January 1 each year.

Plaintiff could not testify to the exact dates he took possession of Farm No. 1167 or began farming it. He testified he began purchasing farming equipment and storing it on the land some time in the autumn of 1976, began farming "in crop year 1977," and took possession of the buildings "in crop year 1978." He moved into the house in July 1979.

On October 22, 1999, defendants served plaintiff with a notice to terminate his tenancy effective March 1, 2000. They also filed an action seeking partition of the three farms. On March 13, 2000, plaintiff filed a declaratory judgment action in the circuit court of Piatt County. In August 2000, defendants served plaintiff with a second notice to terminate his tenancy effective January 1, 2001. They did so because plaintiff challenged the efficacy of their original notice partly on grounds of untimeliness, claiming the lease term coincided with the calendar year.

On May 25, 2001, the trial court issued a memorandum of opinion in which the trial judge determined defendants had the authority to terminate the lease absent the consent of minority interest-holders plaintiff and Grace Dye. He found the parties' oral agreement did not specify a start date and took judicial notice of the fact custom and usage in East-Central Illinois is to begin crop-share leases on March 1. Thus, he found the October 1999 notice effective to terminate the leases as of March 1, 2000. On July 25, 2001, the trial court entered a judgment denying plaintiff the relief he sought. This appeal followed.

## II. ANALYSIS

### A. Defendants' Authority To Terminate Plaintiff's Leases

Plaintiff argues defendants lacked the power to terminate the leases without the unanimous consent of all the joint owners of the farmland in question. No case law in Illinois directly answers the

question and the rule varies in other jurisdictions. Plaintiff urges us to follow those authorities holding the rights and obligations between lessors and lessees are indivisible, thus requiring the unanimous consent of all joint owners to terminate a tenancy. Defendants urge us to follow authorities allowing joint owners to terminate a lease, at least as to their interest in the property.

Plaintiff urges us to adopt the rule espoused by the dissent in *Ahrens v. Dye*, 208 Neb. 129, 302 N.W.2d 682 (1981). In *Ahrens*, 208 Neb. at 130, 302 N.W.2d at 683, four family members jointly owned a tract of farmland which they leased to the husband of one of the joint owners to farm. Two of the joint owners, who together owned an undivided one-third interest in the land, served the tenant farmer with notice to terminate his tenancy and then filed a partition action. *Ahrens*, 208 Neb. at 130, 302 N.W.2d at 683. The tenant farmer continued to farm the land "pursuant to the lease remaining in effect with the other co-owners." *Ahrens*, 208 Neb. at 130, 302 N.W.2d at 683. The Supreme Court of Nebraska held the notice to terminate tenancy was effective to terminate the lease between the tenant farmer and those joint owners who had joined in it, but not between the tenant farmer and the other joint owners. *Ahrens*, 208 Neb. at 132, 302 N.W.2d at 684.

The dissent criticized this rule, stating, it "will lead to confusion and uncertainty in an area of the law where certainty is of utmost importance." *Ahrens*, 208 Neb. at 134, 302 N.W.2d at 685 (Boslaugh, J., dissenting in part, joined by McCown, J.). Instead, dissenting Justice Boslaugh recommended applying the general rule relating to termination for forfeiture to termination of year-to-year leases. That rule states rights and obligations under a lease are indivisible and, therefore, unanimous consent of joint owners is needed to terminate a lease under a forfeiture provision. *Ahrens*, 208 Neb. at 134-35, 302 N.W.2d at 685 (Boslaugh, J., dissenting in part, joined by McCown, J.), citing *Fredeking v. Grimmett*, 140 W. Va. 745, 762, 86 S.E.2d 554, 564 (1955).

Plaintiff argues the rule relating to forfeiture should apply with equal force to this case because "the net result is the same, removal of the tenant." Defendants contend termination of a lease at the end of a yearly term is different in character from termination for forfeiture. The forfeiture cases cited by the *Ahrens* dissent and plaintiff illustrate the difference between forfeiture during a tenancy for a term of years and termination of a year-to-year tenancy. In *Howard v. Manning*, 79 Okla. 165, 169, 192 P. 358, 362 (1920), for instance, the Supreme Court of Oklahoma explained:

> "If the right to enforce a forfeiture accrues and a part of the tenants in common are allowed to elect to enforce the forfeiture, then

the lessee is placed in the inequitable position of being bound by the lease as to part of the tenants [in common] and discharged by a part, which means that the lessee is still liable as a lessee to some of the tenants in common, although he cannot enjoy any of the benefits of his lease without becoming a trespasser and liable for damages to the other owners of the land."

Accord *Fredeking*, 140 W. Va. at 762, 86 S.E.2d at 564.

By contrast, a lease for an indefinite term, such as those of the parties here, is a year-to-year tenancy. It is essentially a lease contract that is completely fulfilled within each year and allowed to be renewed by failure to give the statutorily required notice to terminate. *Winn v. Turner*, 55 Ill. App. 3d 291, 293, 371 N.E.2d 170, 172 (1977). Thus, allowing some joint owners to terminate a year-to-year tenancy (that is, allowing them to opt not to renew it) does not leave the lessee obligated to the other joint owners.

Other policy considerations weigh against the enforcement of forfeiture provisions. Some of these considerations support the rule advocated by plaintiff; others support the rule advocated by defendants. In *Clark-Devon Building Corp. v. Hinrichs*, 308 Ill. App. 69, 73, 31 N.E.2d 394, 396 (1941), a joint owner with an undivided one-ninth interest in a commercial property served her tenants with notice of her intent to enforce a forfeiture provision in the lease three years after all the joint owners had served notice of their intent to enforce the forfeiture provision on the basis of a different alleged lease violation. The First District found the second notice deficient on the ground one joint owner could not forfeit the lease on behalf of her co-owners and then analyzed the effectiveness of the earlier notice. *Hinrichs*, 308 Ill. App. at 73-74, 31 N.E.2d at 396.

In affirming the trial court's injunction enjoining enforcement of the forfeiture clause under either notice, the court noted " '[i]n this State and elsewhere[,] forfeitures are not regarded with favor.' " *Hinrichs*, 308 Ill. App. at 75, 31 N.E.2d at 397, quoting *Illinois Merchants Trust Co. v. Harvey*, 335 Ill. 284, 295, 167 N.E. 69, 736 (1929). One reason for this disfavor is the fact enforcing a forfeiture requires a court to interfere with contractual obligations between parties. *Hinrichs*, 308 Ill. App. at 74-75, 31 N.E.2d at 397. In *Hinrichs*, for example, more than 70 years remained on a 99-year lease when the joint owners sought to terminate the lease under the forfeiture clause. *Hinrichs*, 308 Ill. App. at 70, 31 N.E.2d at 395. This consideration is not implicated where joint owners seek not to renew a year-to-year lease contract. Another reason not to enforce a forfeiture provision is to prevent injustice that may result from ejecting the tenant. See *Hinrichs*, 308 Ill. App. at 75, 31 N.E.2d at 397, quoting *Illinois Merchants*

*Trust Co.*, 355 Ill. at 295, 167 N.E. at 73 (" 'its prevention is within the protecting care of equity whenever wrong or injury will result from its enforcement' "). This consideration is implicated where some but not all joint owners seek to end a year-to-year tenancy.

In further support of his position, plaintiff points to the recognized principle that consent of all joint owners is necessary to create a lease. See, *e.g.*, *Cameron v. Bartels*, 214 Ill. App. 3d 69, 75, 573 N.E.2d 273, 276-77 (1991) (one joint owner could not bind his co-owner to a timber deed without her consent); *Hall v. Boyd*, 347 Ill. App. 60, 62-63, 106 N.E.2d 137, 138 (1952) (one joint owner cannot bind others to a lease; where no practical manner exists to sever the validly leased portion of the property from the remainder, the lease in its entirety is invalid); *Gridley v. Wood*, 206 Ill. App. 505, 509 (1917) (one joint owner cannot bind the other joint owners to a lease of the property without written authority from them to do so unless they ratify the lease). The gist of plaintiff's argument appears to be that the logical corollary to this rule is a symmetrical requirement of unanimous consent of all joint property owners to terminate a lease. We find the necessity of unanimous consent to create a lease more logically supports the opposite conclusion, at least with respect to year-to-year tenancies such as those here at issue. A lease for an indefinite term is a year-to-year tenancy, which the parties thereto may renew each year by failure to give the notice to terminate. *Winn*, 55 Ill. App. at 293, 371 N.E.2d at 172. A requirement of unanimous consent of all joint owners *to renew* the lease each year is more consistent with the requirement of unanimous consent to create the lease in the first instance than would be a requirement of unanimous consent to terminate the lease. Where, as here, some of the joint owners wish to terminate the tenancy, unanimous consent to renewing the lease does not exist.

Cases holding joint owners have the authority to terminate year-to-year leases only as to their own interests are problematic. Treating nonrenewal of a lease as divisible leaves the lessee in the same position as treating forfeiture rights as divisible by allowing some joint owners to create a new lease with the lessee but not others. Such a rule requires joint owners who do not consent to a lease renewal to remain obligated to the lessee nevertheless. In *Ahrens*, 208 Neb. at 130, 302 N.W.2d at 683, for instance, a referee sold the land at the partition sale together with the growing crops. The court found principles of unjust enrichment required both the joint owners who had terminated the lease as to their interests and the joint owners who had not done so to compensate the tenant farmer for his labor and expenses in planting the unharvested crops. *Ahrens*, 208 Neb. at 133-34, 302 N.W.2d at 683-84. The trial court calculated the amount of

the value of the crops each owner had to pay the tenant farmer on the basis of the lease. *Ahrens*, 208 Neb. at 131, 302 N.W.2d at 683-84. The supreme court affirmed this determination. *Ahrens*, 208 Neb. at 134, 302 N.W.2d at 685.

Similarly, in *Cook v. Boehl*, 188 Md. 581, 592-93, 53 A.2d 555, 561 (1947), the Court of Appeals of Maryland held notice to terminate a year-to-year lease by one joint owner effective only as to her interest. When the tenant remained in the building until partition, the court held, "there is no justification for fixing of rent payable by the lessee other than that agreed upon by the parties." *Cook*, 188 Md. at 593, 53 A.2d at 561.

By contrast, in *Meier v. Johannsen*, 242 Iowa 665, 47 N.W.2d 793 (1951), a case closely analogous to that at bar, the Supreme Court of Iowa treated a year-to-year oral crop-share lease as effectively terminated in its entirety by service of a notice to terminate by less than all of the property's joint owners. There, a mother and her son and two daughters jointly owned three farms. The son had farmed all three tracts as a tenant farmer while his father, from whom he and his mother and sisters inherited the farms, was alive. *Meier*, 242 Iowa at 666, 47 N.W.2d at 794. Shortly after the parties inherited the three farms, the mother and two daughters served the son notice to terminate his tenancy and then filed an action for partition of the properties. The son continued to farm the three tracts of land despite the notice to terminate. *Meier*, 242 Iowa at 667, 47 N.W.2d at 794. After partition, the referees brought an action to recover rent from the son. He argued he should have been considered a lessee holding over under the oral crop-share lease and the measure of the rent they could recover should be based thereon. *Meier*, 242 Iowa at 669, 47 N.W.2d at 795-96. He did not challenge the efficacy of the notice. Although the court did not discuss the authority of the other joint owners to terminate the year-to-year lease absent his consent, it stated the son and his wife "had been advised by the notice served upon them *** the lease was terminated." *Meier*, 242 Iowa at 670, 47 N.W.2d at 796. Despite lacking the consent of all joint owners, the notice terminated the lease in its entirety.

The facts of *Meier* are nearly identical to those in the instant case with respect to Farm No. 1167 and Farm No. 1738, where all joint owners other than the tenant farmer agreed to terminate the lease. If all the joint tenants terminate the lease as to their own share, the only joint owner remaining on the lease as a landlord is also the tenant farmer. The logical inconsistency of leasing his interest in the land to himself leads to a conclusion the consent of all joint owners other than an owner who is also the tenant effectively terminates the lease.

Farm No. 1001 presents a different question because another joint owner, Grace Dye, wishes to renew the lease. *Meier* does not address that situation.

We find this court's discussion of new leases in *Hall*, 347 Ill. App. at 63, 106 N.E.2d at 138, more instructive. There, this court discussed the inability of one joint tenant to bind others to a new lease. Although, theoretically, a joint owner has the power to create a lease as to his or her own interest in the property absent the consent of all joint owners, where no practical manner exists to divide that portion of the property from that of the other joint owners, the entire lease is void. *Hall*, 347 Ill. App. at 63, 106 N.E.2d at 138, citing *Fredrick v. Fredrick*, 219 Ill. 568, 581-82, 76 N.E. 856, 861 (1906). The most logical extension of this principle would be to allow joint owners who wish to remain obligated to a lessee on a year-to-year lease to do so only if a portion of the property representing their interest can be severed from the rest of the property so as not to prejudice the rights of the other owners. Conversely, if the property is not readily divisible, neither should be the lease, and unanimous consent should be required to renew it. See *Hall*, 347 Ill. App. at 63, 106 N.E.2d at 138 ("there would be no way of severing the validly leased portion of the premises from the balance without unduly prejudicing the *** cotenant's rights").

Plaintiff argues unanimous consent should be required to terminate the leases at issue because, "[w]hether one would describe this as a partnership or joint venture," it is "more than the usual cotenancy ownership situation." The crop-share leases have more to do with the business of farming the land than with plaintiff's possession of it; however, the same can be said of the crop-share leases involved in *Ahrens* and *Meier*, and yet those cases were decided on principles having to do with real property. See *Meier*, 242 Iowa at 668, 47 N.W.2d at 795 (discussing division of the crops between landlords and tenant as a term of an oral crop-share lease). Further, plaintiff cites no authority and makes no argument to guide a decision based on principles of partnership law. See 188 Ill. 2d R. 341(e)(7) (appellant's brief must include arguments and citation to supporting authorities).

■ In these circumstances, it is logically inconsistent to treat lease obligations as divisible. The approach Illinois courts have taken to joint property owners' authority to enter into new leases leads us to conclude the most sensible rule is one allowing joint owners to terminate a year-to-year tenancy in its entirety once unanimous consent to continue the tenancy no longer exists. The trial court properly concluded defendants had the authority to terminate the leases.

## B. The Start Date of the Lease

Plaintiff next argues the trial court erred in determining the lease began March 1 and ended February 28 each year because (1) Grace Dye's testimony conclusively established the parties actually intended a January 1 start date, (2) the evidence was insufficient to support a finding March 1 is the customary and usual start date for oral crop-share leases in Piatt and Douglas Counties, and (3) knowledge of the customary and usual start dates for crop-share leases in East-Central Illinois is not widespread enough to render judicial notice thereof proper. We disagree.

■ In determining the terms of a contract, the intent of the parties controls. Courts may look to custom and usage to determine terms of the contract only where they cannot discern the parties' actual intent from the evidence. See *Winn*, 55 Ill. App. 3d at 293, 371 N.E.2d at 173 (custom and usage used to ascertain the intent of the parties as to the start date of an oral crop-share lease only after court determined the parties did not agree to a start date). Plaintiff contends Grace Dye's brief testimony irrefutably established the parties intended the lease to run from January 1 to December 31 each year, thus eliminating the need to look to custom and usage to supply a missing term. We disagree.

Grace Dye has an interest in only one of the three farms at issue; thus, even if her testimony is enough to establish the parties to *that* lease intended a January 1 start date, it does not obviate the need to look to custom and usage to supply a start date for the lease terms on the other two farms. Further, we conclude her testimony did not preclude the trial court from finding the parties never specified a start date for the lease on Farm No. 1001.

■ Where a trial court's factual finding reflects a reasonable inference arising from conflicting testimony, a court of review will not overturn the finding unless it is contrary to the manifest weight of the evidence. *Winn*, 55 Ill. App. 3d at 292, 371 N.E.2d at 172. Grace Dye, who is 92 years old, testified only briefly. She testified the lease term on Farm No. 1001 ran from January 1 to December 31 each year. She further testified she wanted plaintiff to farm her land and did not support defendants' efforts to oust him. Defendants' attorney did not cross-examine her. However, her testimony, along with that of the other witnesses, supports the trial court's apparent conclusion the parties had never agreed to *specific* dates the leases were to run.

■ None of the other witnesses, including plaintiff, testified to any specific agreed-upon start dates for any of the three leases. No witness testified they had ever discussed start dates for the leases. All agreed they settled financial obligations relating to the farming operations on

or near January 1 each year. Plaintiff testified he asked defendants and Grace Dye to pay him after January 1 each year to coincide with the calendar year for tax purposes. Defendants' expert witness, Ernest Moody, likewise testified parties to crop-share leases in East-Central Illinois normally settle their finances around the calendar year for tax purposes, regardless of the actual lease term.

The limited testimony as to the general terms of the family's lease agreements supports a conclusion they were undetailed informal agreements among then-amicable family members. Grace Dye testified, "it's his farming, mostly, and about how much do I have and what does the other fellow have." James Daugherty testified he had never discussed any of the terms of any of the leases with plaintiff and did not personally know when the leases began or ended. Bill Hanfland, Helen Short's son-in-law, who has a power of attorney to act on her behalf in matters involving her farm property, testified he believed the lease on Farm No. 1167 ran March 1 to February 28 each year because that is the usual practice in East-Central Illinois and he had no knowledge of any specific agreement to the contrary.

Plaintiff argues in his brief, "the only witness who knew with certainty the lease term was Grace Dye *** and yet, the trial court never mentioned her testimony in its opinion. *** [S]he had more experience than any of the three parties who testified as to the farm operation from a landlord perspective." Nothing in the record indicates she is more involved in the running of the farm or more aware of the terms of the crop-share lease than the other absentee landowners involved in this dispute. Plaintiff's attorney asked Bill Hanfland the basis for his assertion the lease on Helen Short's land runs from March 1 to February 28 but elicited no similar explanation from Grace Dye. Plaintiff never testified to a specific agreed-upon start date for the lease. The trial court could properly conclude she assumed the lease on Farm No. 1001 runs with the calendar year due to the parties' practice of settling their finances at that time, particularly in light of plaintiff's failure to identify a specific lease period.

From this evidence, the trial judge properly could conclude the parties had never discussed, much less agreed upon, specific dates the leases were to run. Thus, looking to custom and usage to supply this missing term was appropriate.

Plaintiff argues Ernest Moody's testimony as to the customary March 1 start date for farm leases in East-Central Illinois was insufficient to support the court's finding because (1) Moody lacked the requisite knowledge of practices in the specific counties where the land in question is situated; and (2) as a professional farm manager, Moody handled written farm leases almost exclusively and, thus, was

not familiar enough with oral crop-share leases to render an opinion. We disagree.

Plaintiff does not challenge Moody's qualifications to testify as an expert regarding the customary and usual terms of crop-share leases in East-Central Illinois; rather, he asserts Moody's knowledge of practices in the two specific counties in which the farms at issue are located is insufficient despite the fact both counties are within the region for which his qualifications were established. In *Winn*, 55 Ill. App. 3d at 292, 371 N.E.2d at 172, this court affirmed the ruling of a trial court which had relied on evidence of custom and usage in East-Central Illinois to supply a missing lease term. Plaintiff fails to explain why farm leasing practices in Douglas and Piatt Counties vary from those in the surrounding counties of East-Central Illinois significantly enough to require us to do otherwise.

Similarly, plaintiff contends Moody's knowledge of oral, as opposed to written, crop-share leases is insufficient to allow him to testify as an expert. Moody testified he had encountered approximately 30 to 50 oral crop-share leases in the five years preceding trial. The trial judge sustained an objection to his proffered testimony as to the number of written crop-share leases he had encountered in the same time period on grounds it exceeded the scope of defendants' cross-examination. Based on his testimony regarding his primary use of written crop-share leases, however, the court could properly infer he had encountered a significant number of such leases in addition to the 30 to 50 oral leases he had encountered. Assuming, *arguendo*, Moody's experience with oral crop-share leases alone was insufficient to qualify him as an expert, plaintiff does not explain how the custom and usage varies significantly enough to require a finding of expertise relating specifically to oral leases. In fact, the record supports the opposite conclusion. In addition to managing farms and appraising rural properties, Moody conducts an annual survey for the Illinois chapter of the American Society of Professional Farm Managers and Rural Appraisers. That survey asks several questions about farm leases, including what dates they run, but does not ask whether the leases are oral or written, indicating the professional organization does not consider this difference relevant. Further, the March 1 start date coincides with the growing season. Plaintiff testified he began preparing the ground and planting crops in the spring of 1977 and did not need possession of the farm prior to that time. We see no reason seasonal dictates would have any different impact on farmers leasing land on oral leases than on farmers operating under written leases.

Plaintiff argues the testimony of more than one witness is necessary to support a finding of custom and usage, citing *Marler v.*

*Moultrie-Shelby Farm Service*, 11 Ill. App. 3d 204, 207, 295 N.E.2d 744, 747 (1973). We disagree. In *Marler*, 11 Ill. App. 3d at 207, 295 N.E.2d at 747, this court stated usage or custom "should *generally* be established by more than one witness so as to raise a presumption that others knew it or should have known it" (emphasis added). Further, although Moody was the only expert to give an opinion as to the customary and usual start date for crop-share leases in East-Central Illinois, other testimony supports the conclusion that date is March 1. Timothy Flavin, plaintiff's expert witness, testified, "[m]ost are a March 1 to February 28 type lease, but not all." Defendant Bill Hanfland testified defendants served the original notice to terminate in October 1999 because they assumed the lease ran March 1 to February 28 because that is when such leases normally run. We conclude the record supports a finding crop-share leases usually and customarily run March 1 to February 28 in East-Central Illinois, including Piatt and Douglas Counties.

■ Finally, plaintiff contends the trial court improperly took judicial notice of the customary and usual start date of crop-share leases in East-Central Illinois. He argues the trial judge relied on his personal knowledge of farming practices in East-Central Illinois from his involvement in the case underlying *Winn*. We find this argument unpersuasive.

In his memorandum of opinion, the trial judge found adequate support for Ernest Moody's opinion testimony regarding the customary and usual March 1 start date for crop-share leases. He then cited *Brookhart v. Langford*, 128 S.C. 350, 353, 122 S.E. 866, 867 (1924), in which the Supreme Court of South Carolina stated knowledge of local usages and customs having to do with tenant farming and marketing of South Carolina's "staple crop" (cotton) was widespread enough within the jurisdiction for courts to take judicial notice of those usages and customs. He then stated, "[f]urther, this court participated in the case of *Winn v. Turner* [citation]." He did not clarify whether he was relying on his personal experience with *Winn*, the authority he cited, or both in taking judicial notice of the customary and usual March 1 start date. We have already concluded the evidence supported a finding of a March 1 start date. We may affirm a trial court's ruling if any reason exists in the record to do so. *Gernand v. Illinois Commerce Comm'n*, 286 Ill. App. 3d 934, 943, 676 N.E.2d 1384, 1389 (1997). We find the record supports a factual determination the usual and customary start date for crop-share leases in East-Central Illinois is March 1. The trial court did not err in so holding.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

McCULLOUGH, P.J., and TURNER, J., concur.